The SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, Plaintiff,

v.

ATLANTIC STEEL INDUSTRIES, INC., Ameristeel Corporation (fka Florida Steel Corporation), Georgetown Steel Corporation, I. Schumann and Company, Meherrin Agricultural and Chemical Company, Mueller Brass Company, National Metals, Inc., Nu-cor Corporation, Nucor–Yamato Steel Company, SMI Steel, Roanoke Electric Steel Corporation, Federal Metals Company, Stackpole Corporation, Waterbury Rolling Mills, Inc., Defendants,

and

Kerr–McGee Chemical Corporation, Macalloy Corporation, Lucent Technologies, Inc., Gaston Copper Recycling Corporation (aka GCRC), Southwire Company, Clariant Corporation, Intervenor Defendants.

The South Carolina Department of Health and Environmental Control, Plaintiff,

v.

Parkans International, Plant–Roberts Chemicals, WJ Bullock, Inc., Maccaloy Corporation, Roessing Bronze, Defendants

The South Carolina Department of Health and Environmental Control, Plaintiff,

v.

Carbone of America Corporation, Madison Industries, Old Bridge Chemicals, Defendants.

Nos. Civ.A. 2:97–726–12, Civ.A. 2:98–345–12 and Civ.A. 2:98–1571–12.

United States District Court, D. South Carolina, Charleston Division.

Aug. 5, 1999.

Jacquelyn Sue Dickman, Columbia, SC, Claron Atherton Robertson, III, Robertson and Associates, Charleston, SC, John C. McElwaine, Kane Jorden von Oppenfeld, Bischoff and Biskind PLC, Columbia, SC, for Plaintiffs.

Talcott J. Franklin, Hunton and Williams, Charlotte, NC, James Y. Becker, Sinkler and Boyd PA, Columbia, SC, David O. Ledbetter, Ellen F. Firsching, Hunton and Williams, Richmond, VA, for Defendant Roanoke Elec. Steel Corp.

James Wilton Orr, Bowers Orr and Dougall LLP, Columbia, SC, for Kerr-McGee Chemical Corp.

Daniel James Brown, Nexsen Pruet Jacobs & Pollard, Columbia, SC, James William Potter, Nexsen Pruet Jacobs and Pollard LLP, Columbia, SC, for Intervenor-Defendant MacAlloy Corp.

James Wilton Orr, Robert Erving Stepp, Glenn Murphy Gray and Stepp LLP, Columbia, SC, Carl H. Helmstetter, Spencer Fane Britt and Browne, Kansas City, MO, for Intervenor-Defendant Tech., Inc.

James H. Bratton, Jr., Thomas M. Barton, Atlanta, GA, James Lynn Werner, Ellzey and Brooks LLC, Columbia, SC, for Movants Gaston Copper Recycling, Southwire Co.

Timothy William Bouch, Leath Bouch & Crawford, Charleston, SC, for Movant Clariant Corp.

## PROCEDURAL HISTORY

HOUCK, Chief Judge.

On March 19, 1997, the South Carolina Department of Health and Environmental Control (DHEC) instituted this action against Atlantic Steel Industries, Inc., Ameristeel Corporation (fka Florida Steel Corporation), Georgetown Steel Corporation, I. Schumann and Company, Meherrin Agricultural and Chemical Company, Mueller Brass Company, National Metals, Inc., Nucor Corporation, Nucor–Yamato Steel Company, SMI Steel, Roanoke Electric Steel Corporation, Federal Metals Company, Stackpole Corporation, and Waterbury Rolling Mills, Inc., (collectively the "defendants") pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Public Law No. 00–499, 100 Stat 1613 (1986), and pursuant to the South Carolina Hazardous Waste Management Act (HWMA). The complaint alleges that each of the fourteen above named defendants ("defendants") is responsible for

the release and threatened release of hazardous substances at (1) the former fertilizer manufacturing facility located at 7747 Highway 17 South, Jericho, South Carolina; (2) the three disposal

areas located nearby along TNT Road (the "Satellite Areas"); and (3) the transportation corridor between the property located at 7747 Highway 17 South and the Satellite Areas (collectively the "Site").

Complaint at 2. The complaint further alleges that DHEC "has incurred, and will continue to incur in the future, response costs for actions taken at the Site as those terms are defined in Sections 101(23), (24), and (25) of CERCLA, 42 U.S.C. § 9601(23), (24), (25)" and that "DHEC has incurred, and will continue to incur in the future, costs pursuant to the South Carolina HWMA." Complaint at 4. DHEC also alleges the defendants are "liable under CERCLA and under the HWMA as responsible parties for removal, remedial and response costs incurred and to be incurred." *Id.* DHEC settled its claims against the defendants and the complaint seeks the court's approval of the Settlement Agreement ("Agreement") which DHEC asserts "DHEC and the defendants have negotiated" and which purports to

> expedite implementation of the cleanup at the Site and to establish certain rights and obligations as between them with respect to both claims asserted [in the complaint] and any claims that might arise or be asserted in the future in connection with the Site and to fully and finally resolves defendants' liability for all such claims as set forth in the Agreement.

*Id.*

Between April 4, 1997, and May 20, 1997, Kerr–McGee Chemical Corporation. Macalloy Corporation, Lucent Technologies, Inc., Gaston Copper Recycling Corporation, Southwire Company and Clariant Corporation (collectively "the Intervenors") moved to intervene in this action Each of the movants asserted that it had an interest in the subject matter of the complaint, that its interest would be impaired by the outcome of the suit, and that it was not adequately represented by the existing parties to the action. The Intervenors also asserted that the proposed Agreement unfairly established a cap of liability for the settling parties and that it left the Intervenors subject to a much greater liability than the liability the Agreement imposes upon the settlors. The Intervenors claim the potential liability imposed on them by the Agreement is disproportionate to their responsibility for the environmental damage at the site. On May 29, 1997, the court heard argument on the motions to intervene and granted the same by oral order.

At the conclusion of the May 29, 1997, hearing the court discussed the Intervenors desires to engage in discovery. During the May 29, 1997, hearing the court did not determine the scope of any discovery that might be allowed in the case but instead gave the Intervenors an opportunity to present the court with proposals regarding the scope of and deadlines for the same. The Intervenors were given thirty days to submit their requests for limited discovery. On June 30, 1997, the Intervenors filed briefs with the court setting forth their proposals regarding discovery. The Intervenors also filed a proposed case management order. DHEC filed a detailed response in opposition to the Intervenors' request for discovery and the Intervenors' request for entry of the proposed case management order urging the court to deny any request for discovery on the grounds that the court is to make its decision regarding the Agreement based solely upon the administrative record prepared by DHEC. On October 7, 1997, the court heard argument from the parties regarding discovery. Ruling from the bench, the court denied the motion for entry of the proposed case management order but issued a schedule for limited discovery. The court declined to expand discovery to include depositions or interrogatories. Instead, the court ordered DHEC to produce the documents referenced in the privilege log which is part of its administrative record or to properly

assert within thirty days a privilege objection to disclosing the same.

The parties filed extensive briefs regarding the fifty documents referenced in the privilege log and the asserted privileges relating to the same. On February 9, 1998, the court heard the arguments of the parties regarding those privileges. The court rejected DHEC's arguments that the documents were protected and ordered DHEC to produce all of the documents listed in the privilege log except for four entries therein consisting of three documents and one larger reference in the log which pertained to several documents.[1] The parties were allowed to submit additional briefs regarding production of the four entries.

On June 1, 1998, the court held a status conference to discuss the remaining four entries in the privilege log and the Intervenors' desires for further discovery. During the hearing counsel for DHEC withdrew DHEC's objection to producing one of the documents and the court ordered DHEC to produce the remaining documents. After hearing counsel for DHEC and counsel for the Intervenors regarding what further discovery, if any, was needed, the court ordered DHEC to designate a witness pursuant to Federal Rule of Civil Procedure 30(b)(6) to be deposed by the Intervenors. The court further ordered the deposition to be limited to four hours.

Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, on July 16, 1998, the court signed an order consolidating Civil Action Numbers 2:98–345–12 and 2:98–1571–12 with this one. All three of the actions involve the same site, common questions of law and fact, and counsel for DHEC has represented to the court that the agreements in the subsequently filed actions can only be approved if the court first approves the one involved herein. The July 16, 1998, order also states that the Intervenors in the Atlantic Steel action will be entitled to the same status in the consolidated action as they occupy in the original one.

Subsequent to signing the order consolidating the cases, the court held a status conference to discuss the Intervenors' desire to pursue additional discovery and to establish a briefing schedule for the parties to present their positions regarding approval of the Agreement. Counsel for the Intervenors informed the court that as long as the Intervenors received no new information as a result of a Freedom of Information Act request which was pending with the Environmental Protection Agency, there was no need for any further discovery. The parties presented the court with their proposals regarding a briefing schedule for the pending motion for approval of the Agreement. After hearing from the Intervenors and from DHEC, the court ordered the Intervenors' to file their briefs opposing entry of the Agreement within sixty days of the hearing. DHEC was ordered to file its response to the opposition thirty days after the Intervenors' filing of the opposition and the Intervenors were ordered to file any reply within ten days of the filing of DHEC's response. According to this briefing schedule, the court received what can only be described as voluminous briefs and affidavits both in support of and in opposition to the motion for approval of the Agreement. It is this motion for approval of the Agreement that is currently before the court.[2]

## FACTS

The Site which is the subject of this suit has a long history that includes a variety

---

1. During the court's document by document analysis, counsel for DHEC withdrew privilege assertions with regards to several documents that DHEC previously argued in its briefs to the court were protected by privilege.

2. DHEC filed its motion for approval and entry of the Agreement on October 2, 1997. The court held the motion in abeyance while the Intervenors pursued the limited discovery ordered by the court.

of owners and usages. The use of the Site relevant to this inquiry began in 1962 when Kerr–McGee Chemical Corporation began operating a fertilizer manufacturing facility at the Site. The manufacturing process involved mixing raw materials, including metals, with sulfuric acid creating an exothermic reaction. This combination of chemicals and raw materials produced granules which were heated to evaporate any moisture present and then cooled to quickly reduce the temperature. During these heating and cooling processes fans were used to blow the resulting exhaust particles out of a smokestack. Kerr–McGee takes the position that no environmental damage occurred during its operation of the Site. DHEC, however, presents a very different picture.

DHEC asserts that prior to 1971, Kerr–McGee operated its plant without any pollution controls which means the exhaust particles blown out of the stack settled on the ground about the Site. DHEC further asserts that by June of 1971, a device known as a scrubber was installed in the stack to constantly spray water which caught most of the previously airborne particles and held them in the water so that they could be more appropriately disposed of. It is DHEC's belief that each day Kerr–McGee utilized the scrubber, 216,000 gallons of dirty scrubber water was created and then illegally discharged via a ditch into the Edisto River. The scrubber, according to DHEC, was modified in the 1970's to stop more of the discharges into the air but the modifications increased the discharges into the soil and groundwater. Finally, DHEC alleges that Kerr–McGee was negligent in its control of operations in that it often used the stack without running the scrubber and that Kerr–McGee is also liable for its intentional acts which include burying pesticides at the Site but reporting to the Environmental Protection Agency that Kerr–McGee never disposed of pesticides there.

After leasing the Site to Stoller Chemical Company (Stoller) for a two-month period in 1978, Kerr–McGee sold the Site to Stoller on July 12, 1978. Stoller operated the Site as a fertilizer manufacturing plant utilizing production processes much like those utilized by Kerr–McGee. It is alleged that Stoller discharged the used scrubber water into an unlined settling pond which was constructed prior to Stoller's purchase of the Site. DHEC asserts that after the settling pond was closed in 1985 and Stoller began recycling the scrubber water using a system of clarifier tanks, the discharges were minimal.

In 1989 Stoller was issued a permit in accordance with the Resource Conservation and Recovery Act (RCRA) and was thereby required to clean up the Site. The Site, however, was never cleaned up by Stoller as required by the permit. Stoller went into bankruptcy which DHEC alleges was a direct result of a criminal investigation into illegal shipments of hazardous waste to Stoller at the Site between July and September of 1991. In December of 1992, two of the Intervenors in this action, Southwire Company (Southwire) and Gaston Copper Recycling Company (Gaston Copper), pled guilty to illegally shipping hazardous waste to the Site. On February 2, 1992, Stoller closed its doors and filed for bankruptcy on March 17, 1992. The bankruptcy trustee subsequently informed DHEC that Stoller had insufficient funds to clean up the Site as required by the RCRA permit.

In the fall of 1993, the EPA initiated a cleanup of the Site pursuant to CERCLA by mailing information request letters to all known potentially responsible parties (PRP's). DHEC assumed the role of the lead agency, began directing the cleanup, and a working group was established to begin funding the cleanup while negotiating liability for the same. The PRP's participating in the working group advanced monies to DHEC to cover costs of the cleanup as they arose but these interim advances were not considered to be admissions of responsibility. Voting power within the group was assigned according to the

amount of money each PRP advanced to DHEC. Parties paying more money received a greater voting power.

The parties sharply disagree with respect to the events following the initial meeting of the EPA, DHEC, and the PRP's as well as the import of those events. It is this negotiation and settlement process that forms the basis of the Intervenors' claims that the Agreement reached during the process is both procedurally and substantively unfair. The Intervenors' claims of both procedural and substantive unfairness focus primarily on DHEC's settlement with and relationship with Nucor Corporation and Ameristeel Corporation.

Nucor and Ameristeel were represented during the settlement negotiations by the law firm now known as von Oppenfeld, Hizer, and Freeze who entered into a settlement agreement with DHEC on behalf of Nucor and Ameristeel. The Agreement at issue here assigns to the fourteen settling defendants a share of less than two percent of the total soil cleanup through the groundwater study and less than two and one-half percent of the total groundwater cleanup costs. *See* Agreement at §§ VII(C) and (E) and Attachment A, Parts 1 and 2. The Agreement further requires DHEC to pursue a contribution action against the nonsettling PRP's to recover on behalf of the settling defendants under a theory of joint and several liability all monies paid by the settling defendants that exceeds their negotiated percent of liability as set forth in the Agreement. *See* Agreement at VII(D)(1), (2), and (3). The Agreement also requires DHEC to continue its employment of the von Oppenfeld attorneys to represent DHEC in the contribution action and to seek to recover attorneys' fees for the von Oppenfeld attorneys along with any judgment for contribution. *See* Agreement at § VII(C)–(E).

The Intervenors claim that they were wrongfully excluded from the working group so that the Intervenors could later be labeled as recalcitrant thereby allowing the settling PRP's to seek contribution from the Intervenors. The Intervenors also claim that DHEC improperly settled with the original fourteen defendants capping their liability at an amount disproportionate to each defendant's responsibility for damage to the Site and that DHEC's contracting with the attorneys who formerly represented Nucor and Ameristeel and permitting them to sue in DHEC's name for contribution are inappropriate actions for the agency and create an inappropriate relationship between the agency and lawyers who formerly represented parties adverse to the agency. Asserting that the von Oppenfeld attorneys had too much control over the creation of the allocation model that forms the basis of the Agreement, the Intervenors assert the record before the court is faulty. The Intervenors also point to numerous documents which were not made a part of the administrative record and which the Intervenors assert give rise to the inference that the commitment of the von Oppenfeld attorneys to the interests of their former clients did not diminish as the attorneys sought and undertook employment by DHEC. Among the documents conspicuously omitted from the record are letters from the von Oppenfeld attorneys to DHEC identifying "target" defendants and proposed litigation strategies intended to shape the cleanup in a manner that would later benefit the attorneys' former clients.

## ANALYSIS

DHEC quite correctly urges the court to give attention to the strong public policy in favor of settlement of CERCLA disputes. *See Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368, 1372 (6th Cir.1976). The court is aware of the reasons for encouraging settlement of cases involving environmental damage which include, but are not limited to, expediting cleanup and keeping litigation costs as low as possible for both the government and the private parties involved. There is also a worthy public

policy in favor of open negotiations between DHEC and all PRP's so that each settlement presented to the court brings with it a level of reliability that only comes from a process that has been fair and open to all the parties.

Obtaining approval of a proposed settlement agreement has very serious implications. Congress has provided that any person who is alleged to be a responsible party under CERCLA and who "has resolved its liability to the United States or a State in an administratively or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). Therefore once a person negotiates an admission of liability with the agency responsible for the cleanup, the goal becomes judicial approval of that agreement. Judicial approval means the settling party cannot be sued in the future for contribution by other responsible parties who believe those not a party to the settlement paid more than their share of the cleanup costs. Because of the significant advantages that are sometimes available to a party who settles early and obtains contribution protection, any proposed settlement agreement must be adjudged to be "fair, reasonable, and faithful to the objective of the governing statute." *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir.1990).[3]

DHEC has repeatedly encouraged the court to limit its review to the administrative record assembled for this action, and the court agrees that this is a correct statement of the law.[4] Congress has specifically limited judicial review of a proposed CERCLA consent decree or settlement agreement to the administrative record prepared by the agency seeking approval of the same. *See* 42 U.S.C. § 9613(j)(1). When Congress chose to limit judicial review to the administrative record, it did so because such a limitation "expedites the process of review, avoids the need for time-consuming and burdensome discovery, reduces litigation costs, and ensures that the reviewing court's attention is focused on [the appropriate issues]." H.R.Rep. No. 99–253, 99th Cong., 2d Sess. (1986). The limitation of review to an administrative record "exists to ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional." *Virginia Agricultural Growers Assoc., Inc. v. Donovan*, 774 F.2d 89, 92 (4th Cir.1985).

The purpose of the court's reliance on an administrative record when reviewing a proposed settlement agreement is analogous to the reliance on an administrative record by a court when it is asked to review the propriety of an environmental response action after completion of a cleanup. In both situations the necessity for "reliance on the administrative record helps assure that the basis for the response decision is clearly articulated and open to scrutiny by the public and responsible parties. It also encourages full responsible party and public participation in development of the record ..." which is intended to form the sole basis of the court's decision both in considering a proposed settlement and in reviewing any post-cleanup challenge. H.R.Rep. No. 253(I), 99th Cong., 2d Sess. (1986). The legislative history of the amendment limiting judicial review to the administrative record in a post-response action also suggests that in the analogous situation of considering a proposed settlement, the limitation ensures the agency's "decision is based on adequate information to which the public and potentially responsible parties have access." H.R.Rep. No. 253(III), 99th Cong., 2d Sess. (1986). The limitation

---

**3.** The parties in this action conceded early in the case that the test set forth in *Cannons* is the appropriate test to be applied by the court in reviewing a proposed settlement agreement.

**4.** *See* Transcript of May 29, 1997, hearing at 28, and Transcript of October 7, 1997, hearing at 58.

on review functions to ensure the "administrative record [before the court] contains sufficient information to permit all parties concerned to adequately review the action undertaken or ordered." *Id.*

The court itself is certainly a concerned party as the term was intended in the House Report on the limiting amendment. Therefore the administrative record presented to the court must contain sufficient and reliable information to allow the court to adequately review a proposed settlement agreement. The Intervenors in this case, however, assert that the administrative record is unreliable because of the way it was prepared and should not be given the presumption of reliability normally awarded to the same. The Intervenors further assert that DHEC purposefully excluded some information from the record, that DHEC improperly relied upon information from the settling parties in choosing an allocation formula, and that DHEC allowed the von Oppenfeld attorneys to unfairly participate in the development of the settlement as well as in the creation of the administrative record. The Intervenors also assert that DHEC gave the von Oppenfeld attorneys improper access to, and therefore participation in the resolution of, defenses and information in support thereof provided to DHEC by the Intervenors prior to the negotiation of the Agreement.

Even in the situation "where review of a case is confined to the evidence contained in the administrative record, . . . evidence of bad faith or improper behavior by an administrative agency's official in compiling that record justifies inquiry beyond the record compiled." *United States v. Shaffer Equipment Co.,* 11 F.3d 450, 460 (4th Cir.1993) (*citing Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The court must sometimes look beyond the administrative record presented to the court because the integrity of the administrative record is relevant to the inquiry into the propriety of an agency's decisions or its

actions. *Id.* at 460, 91 S.Ct. 814. Because the Intervenors have presented the court with sufficient allegations regarding the integrity of the administrative record presented to the court by DHEC, the court is obligated to look beyond that record in order to determine the reliability and trustworthiness of the same.

In their memorandum in opposition to the approval of the Agreement, Gaston Copper, Southwire and Clariant direct the court to the transcript of the Rule 30(b)(6) deposition of Keith Lindler who is the Director of DHEC's Division of Site Assessment and Remediation. During his deposition Mr. Lindler was asked, "So you took things into consideration in making the settlement agreement which are not documented in the administrative record?" Mr. Lindler's response was, "In reaching a settlement, yes." Lindler Transcript at 41. The memorandum in opposition also points out that in responding to a comment objecting to the Agreement as being based upon an unfair negotiation procedure, DHEC took the position that "the negotiations [with Nucor and Ameristeel] were not in secret." Response to Gaston/Southwire Comment 1(a). However, in his deposition Mr. Lindler took a very different position stating that DHEC never informed any of the other PRP's about DHEC's negotiations with Nucor and Ameristeel and that DHEC has no responsibility to inform other parties when it is privately negotiating with another party. *See* Lindler Transcript at 86–87.

It is hard to imagine how DHEC's engaging in negotiations with Nucor and Ameristeel behind closed doors for almost two years without telling any of the other PRP's could be anything but secret. While the court understands that DHEC cannot be sent "into the toxic waste ring with one arm tied behind its collective back," neither can DHEC "mislead any of the parties, discriminate unfairly, or engage in deceptive practices." *Cannons,* 899 F.2d at 93. Furthermore, the court is required to " 'scrutinize' the settlement

process" and it cannot do so if all pertinent facts are not included in the administrative record before the court. *See U.S. v. Montrose Chemical Corp. of California*, 50 F.3d 741, 746 (9th Cir.1995).

DHEC also admits that the information used by DHEC to create the allocation formula upon which the Agreement is based came from the von Oppenfeld attorneys in 1995 when the von Oppenfeld attorneys were still employed by Nucor. *See* Lindler Transcript at 43. This is the same allocation proposal that the working group had previously rejected, presumably because it was too favorable to Nucor's interests. DHEC further admits that the von Oppenfeld attorneys "provided [to DHEC] the bulk of the information" that serves "as exhibits to support certain actions or certain assumptions or assertions" in the Agreement and therefore the record before this court. Lindler Transcript at 43. There is also evidence that DHEC and the von Oppenfeld attorneys were inappropriately working together in that on at least one occasion DHEC and the von Oppenfeld attorneys discussed the contents of responses the agency had received from one of the Intervenors. *See* Lindler Transcript at 91. The fact that DHEC discussed the Intervenors' position with the von Oppenfeld attorneys while the attorneys were employed by Nucor leads the court to conclude that DHEC was, in fact, allowing the von Oppenfeld attorneys to have access to and participate in the building of the record in ways that no other party was allowed to participate. DHEC cannot allow attorneys for one party to influence the negotiation of a settlement as well as the assembly of an administrative record in support thereof in such a way and then present the same to the court expecting the court to believe the final product is reliable.

The court cannot rely upon a record assembled by DHEC and its new attorneys (who are the former attorneys for two of the settling parties) when the person designated by DHEC as its representative testifies that the administrative record does not reflect all that the agency considered in settling with the defendants. The intent of Congress that the "basis for the response decision be clearly articulated in the record and open to scrutiny by the public and responsible parties" was ignored in the preparation of the administrative record in this case. H.R.Rep. No. 253(I), 99th Cong., 2d Sess. (1986). Without this information being included, the public had no opportunity to comment on it and the other PRP's did not have full access to it. Furthermore, there can be no doubt that in engaging in a selective and special relationship with counsel for certain defendants DHEC disregarded the directive of Congress to proceed in a manner that "encourages full responsible party and public participation in the development of the record." *Id.* Having failed to create the administrative record in the manner that Congress intended, DHEC and the settling defendants have failed to present this court with a sufficient basis upon which to make a difficult decision that is statutorily limited to the review of a complete administrative record.

In addition to the fact that the Congress intended that prior to a court's approving a proposed CERCLA settlement agreement the court be presented with a complete and reliable administrative record that is the product of full and fair participation of all involved parties, the administrative record presented to the court must also be trustworthy. In explaining this court's concern about the reliability of the administrative record now before it, it is instructive to examine why Congress is of the opinion that documents prepared by agencies are considered trustworthy.

Congress has instructed the courts that when a governmental agency properly prepares a record in the course of its duties, that record brings with it such a high level of credibility and reliability that any record so created may be admitted into evidence despite the exclusion normally required by the hearsay rule. *See* Fed.

R.Evid. 803(8)(c). Because Congress has declared records properly prepared by a government agency are inherently reliable, a trial court is entitled to presume that tendered public records are trustworthy. *See Johnson v. City of Pleasanton,* 982 F.2d 350, 353 (9th Cir.1992). These instructions from Congress regarding the reliability of public records are "premised on 'the assumption that a public official will perform his duty properly . . .' " and it assumes public records are reliable "because of the reliability of the public agencies usually conducting the investigation, and 'their lack of any motive for conducting the studies other than to inform the public fairly and adequately.' " *Ellis v. International Playtex, Inc.,* 745 F.2d 292, 300 (4th Cir.1984) (*citing* Fed.R.Evid. 803(8)(c) Advisory Committee Note and *Kehm v. Proctor & Gamble,* 724 F.2d 613, 618 (8th Cir.1983)).

Although Congress has instructed the court that it may rely upon public records properly prepared by governmental agencies, such records are to be considered by a court only if the contents of the records are trustworthy. *See Distaff, Inc. v. Springfield Contracting Corp.,* 984 F.2d 108, 111 (4th Cir.1993). Allowing the court to question the trustworthiness of such records ensures that the facts of each case support the Congressional presumption that because a governmental agency prepared the report it is trustworthy and allows the court to assure itself that no bias or motivational problem influenced the preparers. *Id.*

The preparation of the record by DHEC with the von Oppenfeld attorneys and the parties' adversary turned attorney-client relationship raises serious questions about the motivations of the parties who prepared the record and its trustworthiness. The most troubling issue about the trustworthiness of the administrative record in this case is the fact that the von Oppenfeld attorneys played such a major role in its creation. Mr. Lindler testified that the most important part of the Agreement and therefore the record, the allocation, was merely changed by the von Oppenfeld attorneys when DHEC asked them to and that it was typed and physically put together at the offices of the von Oppenfeld attorneys. *See* Lindler Transcript at 42 and 43. Although DHEC may have requested the von Oppenfeld attorneys make certain changes in the allocation model included as part of the record, the fact that the basis of the entire Agreement and the record had its genesis with the von Oppenfeld attorneys leads the court to conclude the attorneys' interaction with DHEC may have allowed the von Oppenfeld attorneys to manipulate the creation of the record.

Congress has made it clear that it presumes an agency like DHEC operates with a standard of practice that makes the agency's records and reports inherently reliable. Congress has not made the same presumption about the von Oppenfeld attorneys and therefore the work of the von Oppenfeld attorneys cannot be given the same presumption in this court. This presumption is not one to be considered lightly; Congress has determined agencies like DHEC are so committed to the public that the records produced by the same are reliable and are based upon the agencies' motivation to serve the public. There is no evidence in this case that the von Oppenfeld attorneys should be considered to be likewise committed to the public interest. The court concludes the contrary to be the case.

For the foregoing reasons, the administrative record presented to this court in support of the Agreement between DHEC and the settling defendants is tainted to the point that the court cannot rely upon it in its present condition. The motion for approval and entry of the settlement agreement is, therefore, denied.

**AND IT IS SO ORDERED.**