**COEUR D'ALENE TRIBE, Plaintiff,**

v.

**ASARCO INCORPORATED; Government Gulch Mining Company, Inc.; Federal Mining and Smelting Co., Inc.; Hecla Mining Company, Inc.; Sunshine Mining Company, Inc.; Sunshine Precious Metals, Inc.; and Union Pacific Railroad Company, Defendants.**

**United States of America, Plaintiff,**

v.

**ASARCO Incorporated,
et al., Defendants.**

**No. CV 91–0342–N–EJL.**

United States District Court,
D. Idaho.

Sept. 3, 2003.

Howard A. Funke, Raymond C. Givens, Givens & Funke, Coeur d'Alene, ID, for Plaintiff/counter-defendant.

John W. Phillips, Michael R. Thorp, Heller, Ehrman, White & McAuliffe, Seattle, WA, Anthony R. Picarello, Jr., Covington & Burling, Washington, DC, M. Michael Sasser, Sasser & Inglis, Albert P. Barker, Barker, Rosholt & Simpson, Bruce C. Jones, Spencer M. Reese, Evans Keane, Boise, ID, Elizabeth H. Temkin, Kristin

Tita, Temkin, Wielga & Hardt, William A. Hillhouse, II, Robert F. Copple, Stephanie C. Stimpson, Parcel, Maro, Hultin & Spaanstra, Robert W. LAwrence, Davis, Graham & Stubbs, Denver, CO, Fred M. Gibler, Charles L.A. Cox, Evans, Koontz, Boyd, Simko & Ripley, Kellogg, ID, William F. Boyd, Coeur d'Alene, ID, Larry A. Gantenbein, Morris O' Haggerty, Union Pacific Railroad, Salt Lake City, UT, Thomas E. Greenland, Union Pacific Railroad Co., Omaha, NE, for Defendants.

## ORDER

LODGE, District Judge.

## I. INTRODUCTION

### A. Nature of Case

While there is ample room for disagreement on the facts and the law as it is to be applied to this case, it is undisputed that this case is unique in its size, its history and its complexity. The case is of great importance and calls for the exercise of the greatest care and caution in its consideration, a task that is very difficult when expert witnesses with impeccable qualifications reached opposite conclusions on almost every issue. In *McCarthy v. Bunker Hill & Sullivan Mining & Concentrating Co.*, 164 F. 927 (9th Cir.1908), *cert. denied*, 212 U.S. 583, 29 S.Ct. 692, 53 L.Ed. 660 (1909),[1] a case heard by the Ninth Circuit in 1908, concerning the issues that were in their infancy on matters pertaining to this very case, the Court commented on the fact that "the briefs also disclosed intense feelings on the part of opposing counsel, which, perhaps is not unnatural in view of all the circumstances of the case and of the large interests involved." *Id.* at 939. It is this Court's opinion that in this regard, nothing has changed.

---

1. The court refused to grant a permanent injunction to enjoin a lawful business which would necessitate closing mines and mills. The court reasoned the damage from the tailings discharges was small when compared to the livelihood provided directly and indirectly by the mining.

The Court allowed the parties sufficient time after the taking of the evidence to negotiate settlements. The Tribe and Asarco reached a settlement. No other settlements were reached. The Court is now prepared to rule on the evidence and law.

After listening to approximately 100 witnesses, 78 days of trial and having reviewed 8,695 exhibits and over 16,000 pages of testimony, it is the judgment of this Court that while CERCLA was enacted to protect and preserve public health and the environment by facilitating the expeditious and efficient cleanup of hazardous waste sites, the conditions in the Coeur d'Alene Basin have and are improving through the joint efforts of the EPA, the Tribe, the State of Idaho, the private sector (including the land owners) and through the natural recovery of mother nature. The liability of certain responsible parties including Hecla and Asarco is evident, but the Defendants are correct when they argue that there has been an exaggerated overstatement by the Federal Government and the Tribe of the conditions that exist and the source of the alleged injury to natural resources.

To put this case in proper perspective, one has to review the history of over 100 years of mining in the Coeur d'Alene Basin, what efforts were made to deal with the problems as they became evident, what direction the Courts and the State of Idaho legislature gave to interested parties, what contribution, if any, the Federal Government and Tribe made to the conditions, how urbanization, forest fires and floods also impacted the environment, how settlements between certain parties may have changed the landscape and what are the observations and experiences of the people who live in the Coeur d' Alene Basin today.

The industrial revolution has given way to the environmental revolution. In the 1960s, this country began to recognize the importance of taking steps to protect the environment and to curtail or limit the impact of mining for metals necessary for society. It is undisputed that the mining companies in the Silver Valley were impounding their mine tailings by 1968. CERCLA was passed in 1980 and seeks to hold the mining companies liable for many acts that were taken prior to the existence of the statute. The mining companies have attempted to comply with the applicable environmental regulations to minimize the impact of mining. Testimony establishes that Defendants Asarco and Hecla followed the evolving commonly accepted mining practices of the day and even took steps beyond what was required to limit the impact to the environment. Many of these steps were approved by the trial and appellate courts.[2] The economic livelihood provided by mining in the Silver Valley cannot be ignored when considering the legal issues before the Court. Mining provided jobs and materials needed both in times of peace and war.

■ This Court is charged with upholding the laws of this country. In meeting this charge, the Court must look to the language of the statute and the interpretations by other courts. In the case of CERCLA, the Court's finds its hands are often tied and "justice" is dictated by the statutes passed by politicians who at the time could not have imagined the factual scenario pending before this Court. CERCLA has the well-intended purpose of protecting the health and well being of the environment and its inhabitants. But by the time CERCLA was passed, much of the damage to the environment due to mining in the Coeur d'Alene Basin had

**2.** *See In McCarthy v. Bunker Hill & Sullivan Mining & Concentrating Co.,* 164 F. 927 (9th Cir.1908), *cert. denied,* 212 U.S. 583, 29 S.Ct. 692, 53 L.Ed. 660 (1909); *Luama v. Bunker Hill & Sullivan Mining & Concentrating Co.,* 41 F.2d 358 (9th Cir.1930).

already been set in motion and could not be reversed by the passage of a comprehensive environmental statute. CERCLA is to be liberally construed to achieve its goals, but "we must reject a construction that the statute on its face does not permit and the legislative history does not support." *Carson Harbor Village v. Unocal Corp.*, 270 F.3d 863, 881 (9th Cir.2001), (en banc), *cert. denied*, 535 U.S. 971, 122 S.Ct. 1437, 152 L.Ed.2d 381 (2002), (citing *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1363 (9th Cir.1990)). Justice and fairness is what is required in this complex case. The Court will apply both these qualities in considering the applicable statutes and the relevant facts.

## B. Plaintiffs' Claims

Plaintiff United States seeks to recover from the Defendants for response costs, natural resource damages under CERCLA and for natural resource damages pursuant to the Clean Water Act ("CWA"). The Tribe seeks to recover from the Defendants for natural resource damages under CERCLA.[3] The Court will set forth the elements which must be established by a preponderance of the evidence for the Plaintiffs to prevail on each claim.

The elements of a response costs claim under CERCLA:[4]

A. each mining-related property owned and operated by a defendant is a "facility;"

B. a "release" or "threatened release" of a "hazardous substance" from the facility has occurred;

3) the release or threatened release has caused the United States to incur response costs; and

1. Defendants fall within at least one of the four classes of responsible parties described in § 9607(a).[5]

■ The elements of a natural resource damages claim under CERCLA:[6]

1. each mining-related property owned and operated by a defendant is a "facility;"

2) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred;

3) Defendants fall within at least one of the four classes of responsible parties described in § 9607(a);

4) *natural resources*[7] within the trusteeship of the Plaintiffs have been injured; and

---

3. The Court notes that the Tribe and Asarco have reached a settlement in this matter. Accordingly, the Tribe's remaining claims are only against Hecla.

4. 42 U.S.C. § 9607(a), *Cose v. Getty Oil Co.*, 4 F.3d 700, 703–04 (9th Cir.1993).

5. Responsible parties are defined as:
(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by

another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable .... 42 U.S.C. § 9607(a).

6. 42 U.S.C. § 9607(a). There is no requirement that response costs be incurred in order to recover damages for injuries to natural resources. *New York v. General Electric Co.*, 592 F.Supp. 291, 298 (N.D.N.Y.1984).

7. 42 U.S.C. § 9601(16) defines "natural resources" as "land, fish, wildlife, biota, air, water, ground water, drinking water supplies,

5) that the injury to natural resources "resulted from" a release of a hazardous substance.

The elements for a claim under the Clean Water Act: [8]

A. there was a discharge of a hazardous substance;

B. from an onshore facility owned or operated by the Defendants;

C. into or upon the navigable waters of the United States; and

D. that natural resources have been damaged or destroyed as a result of the discharge.

## C. Defendants' Claims

Defendants do not dispute that tailings were released into the environment as a result of mining in the Coeur d'Alene Basin. Defendants disagree with the percentage of liability Plaintiffs seek to hold each defendant responsible for and argue that other causes outside their control have negatively impacted the environment. Defendants also seek to hold the United States liable for contributing to hazardous substance releases. Defendants also disagree with the Plaintiffs' claims of "injury" to natural resources and claim instead the environment is better off now as compared to the study in the 1930s and the environment is naturally repairing itself. Finally, even if liability is established, Defendants maintain application of CERCLA is unconstitutional.

## II. FINDINGS OF FACT

Since this was a bench trial involving primarily battling experts, it is up to the Court to weigh the evidence presented and to attempt to ascertain the truth. Based upon the evidence contained in the record and presented at the trial, the Court finds that the facts are as follows. To the extent the Court has concluded that the evidence in the record does not support certain assertions, allegations or claims made, they will not be included in the Court's finding or otherwise referenced herein. The failure to mention an act, event or series of events in these findings is an indication that the evidence submitted to the Court does not support a finding and conclusion in favor thereof.

### A. Asarco as Owner and Operator.

1. Asarco is an owner and/or operator for purposes of CERCLA.

2. Asarco's corporate representative, Chris Pfahl testified as to the history and ownership interests of the company. The American Smelting and Refining Company was organized in 1899 and changed its name to Asarco Incorporated in the 1970s. In 1953, Federal Mining and Smelting Company ("Federal") merged into Asarco. Empire State–Idaho Mining and Development Company ("Empire") was formed in 1898 and was merged into Federal in 1903.

3. Asarco and/or its predecessors in interest owned and/or operated the following mines and mills: the Tiger–Poorman Mine and Mill; Morning Mine and Mills; Last Chance Mine and Mill and Sweeney Mill; Page and Blackhawk Mines, Page Mill, and Page Swamps and Impoundments; Standard–Mammoth Mine and Mills; Helena–Frisco Mine and Mill; Coeur Mine and Mill; Galena Mine and Mill, and the Osburn and Galena Tailings Impoundments.

---

and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by" the United States, a State or an Indian Tribe.

**8.** 33 U.S.C. § 1321(f)(4).

### B. Hecla as an Owner or Operator.

1. Hecla is an owner and/or operator under CERCLA

2. Mr. White, Mr. Drew, Mr. Noyes and Mr. Rosasco provided information regarding the corporate history of Hecla via Rule 30(b)(6) depositions. In 1891, the Hecla Mining Company was first incorporated in Idaho. In 1898, an entity called the Hecla Mining Company was incorporated in Washington. Thereafter, the properties belonging to the Idaho Hecla Mining Company were transferred to the Washington corporation and the Idaho corporation was dissolved. In 1983, the Hecla Mining Company remained incorporated in Washington.

3. In 1983, Hecla merged its Washington corporation into a newly-created Delaware corporation named Hecla Mining Company that was the successor to the Washington Hecla Mining Company. The Hecla Mining Company that was incorporated in Delaware in 1983 succeeded to all of the liabilities of the Hecla Mining Company previously incorporated in Washington.

4. Hecla and/or its predecessors in interest owned and/or operated the following mines and mills: the Hecla Mine and associated mills, the Star Mine and Mill, the Hercules Mine and Mills, the Sherman Mine and Mill, the Dayrock Mine and Mill, the Lucky Friday Mine and Mill, the Gold Hunter Mine and associated mills, and the Tamarack and Custer Mine and associated mills.

### C. Releases of Hazardous Substances

1. Dr. Quivik is an expert witness for the United States in the field of the history of technology. He described historic milling operations of mills or mineral concentrators in the Coeur d'Alene Basin. His testimony primarily focused on mill ownership, operation, and waste disposal practices. Drs. Bull and Stott were the experts retained by the parties to calculate the amount of tailings released.

2. Due to the expansion of the railroad lines in northern Idaho, ore production in the Coeur d'Alene mining district started to escalate in the late 1890's. The waste product of the milling process is referred to as tailings. Depending on the method of milling being used the size of the tailings varied. Generally speaking, jig tailings are about 1/2 inch to 3/8 inch in size and floatation tailings are 1/100th of an inch in size. Floatation method dominated by 1926. Tailings were disposed of by impounding or stacking on surface soil, returned to mine as underground fill (sandfill) or discharged directly into waterway (creek or river).

3. Tailings management became a serious issue for all mining companies due to the sheer volume of tailings being released by the mines and mills.

4. To alleviate problems arising from tailings reaching the South Fork of the Coeur d'Alene River, the mining companies formed the Mine Owners Association ("MOA") in 1901. The MOA's first order of business was to build two dams for the purpose of impounding tailings. These dams, known as the Osburn and Pine Creek Dams, were both in place by 1902. Also, an association of mining companies operating on Canyon Creek, known as the Canyon Creek Tailings Association, built the Canyon Creek dam in 1907.

5. These dams impounded tailings generated at mills owned by the mining companies until a huge flood event breached the three dams in 1917.

6. The dams were not repaired due to the MOA's purchase of overflow easements and of land within and adjacent to the floodplain of the South Fork and Mainstem of the Coeur d'Alene River. The MOA, through its trustee and the Debris Fund, purchased over 5,000 acres of land and 45,000 acres of overflow easements. The land and the overflow easements were purchased by the mining companies to ensure that persons downstream of mining operations were compensated for potential property damage due to tailings deposition.

7. As mining operations continued to grow and finer tailings were produced through flotation milling methods, the mining companies took steps to try to prevent tailings from reaching Lake Coeur d'Alene. To that end, the mining companies constructed the Cataldo Dredge in 1932 through the Dredge Fund by which to remove tailings from the Coeur d'Alene River. The dredge operated from 1932 until 1968, the year tailings impoundments were in place at all operating mills. The dredge

was successful in removing over 32 million tons of tailings from the river.

8. Forest fires, channelization and urbanization has impacted the waterways and soil, but the largest source of metal loading in the Basin is from mining waste. Separating the damage to the environment from other causes versus the mining waste will be determined in the second phase of trial.

9. Twenty-two mills were investigated by Dr. Bull and Dr. Stott and this represents 97–98% of mining production in Basin.

10. After researching or estimating recovery rates [9] and adjusting for impoundments and use of tailings as sandfill during the mining process, Dr. Bull calculated total tailings released into the waterways in the Basin at 64,390,000 tons. Asarco is responsible for at least 22% [10] of the historical total and Hecla's is responsible for at least 31% [11] of the historical total releases of tailings which contained hazardous substances. Together, these two Defendants were responsible for over one-half of the total tailings disposed of in the Basin.

9. Recovery rates are based on tonnage that went into mill compared to amount of concentrate that came out of mill, processing methods used and type of concentrate being extracted. It is impossible to know exact recovery rates, but the experts' estimated recovery rates are reasonable based on the historical information available regarding milling methods used.

10. Dr. Stott used total adjusted production in the Basin of 87,126,000 tons and Asarco responsible for 19,482,000 tons of the total or 22.36%. Ex. Ex. 7258, 7259. Dr. Stott calculated 73,069,953 total Basin tailings after ad-

justments for impoundments and sandfill and Asarco's share after adjustment of 16,129,415 tons or 22%. Therefore, regardless of whether the Court relies on Dr. Bull's or Dr. Stott's calculations, the responsible percentage for Asarco remains 22%.

11. Hecla's percentage is calculated using total tailings in the Basin not impounded or used as landfill, the responsible percentage is 31% (Hecla's 20.15 million tons/total 64.39 million tons in Basin). Ex. 9118. Hecla provided no expert to counter Dr. Bull's totals for Hecla. Dr. Stott allocated 33% liability to Hecla.. Ex. 7259.

11. Separately, each defendant released more than a de minimis amount of hazardous substances into the environment. The amount of historical tailings contributed by each Defendant are in such quantity that at least some of the injury in the Basin would have occurred if only Asarco's or only Hecla's amount of tailings had been released into the environment.

12. Variations exist in the amount of lead, cadmium and zinc in the tailings, but all experts agreed tailings contain lead, cadmium and/or zinc and such are hazardous substances under CERCLA.

13. The releases of hazardous substances continue in the water, ground water and soil during the cyclical high water events in the Basin.

14. Additionally, there are ongoing releases of hazardous substances from the leaching at mining adits, tailings impoundments, and waste rock piles. The exact amount of injury due to such leaching and seepage should be established at the next phase of trial.

15. Releases of hazardous substances have flowed downstream via the tributaries of the South Fork of the Coeur d'Alene River and Coeur d'Alene River. Such releases are flowing into Lake Coeur d'Alene and on out the lake into the Spokane River.

**D. Injury from Releases**

1. The releases that occurred in the Basin and continue to occur, have caused injury to natural resources in the Basin.

2. Leaching of hazardous metals from mining waste, including mixed tailings and alluvium in the beds and banks of the rivers and streams of the Basin, occurs whenever mining waste is exposed to elements and this creates a cycle of continuing releases of hazardous substances.

3. While there has been some improvement since the environment was studied by Ellis in the 1930s, concentrations of metals in surface water, ground water, soil and sediments are not recovering to the extent or within the time frame dictated by CERCLA and related statutes.

4. The co-mingled mining waste is the primary cause of the damage to natural resources in the Basin.

5. Water quality criteria are exceeded for metals in the South Fork and its tributaries and this is primarily due to the metals from the tailings. While it is true the Box contributes significant metals to the water flowing into Lake Coeur d'Alene, the co-mingled metal loads upstream of the Box by these Defendants are significant enough to cause the injury to the water quality even after discounting the metal loads from the Box.

6. Ground water is affected by mining waste as demonstrated by metals content levels which exceed drinking water standards and aquatic life criteria.

7. Sediment concentrations of metals throughout the Basin exceed the applicable baseline. Vegetation has been impacted by the mining hazardous substances. Reduced vegetation for the South Fork of the Coeur d'Alene River is primarily due to the metals contamination from mining tailings.

8. The levels of lead in the lower Basin are affecting certain species of birds

in the wetlands of the lower Coeur d'Alene Basin primarily as a result of their eating habits. While the overall population of other types of birds are increasing, the tundra swan in particular are being injured by the release of hazardous substances found in their food source.

9. Certain fish in the Coeur d'Alene Basin, particularly the South Fork of the Coeur d'Alene River and its tributaries have not adapted so readily as other species showing some injury from the mining tailings released by the Defendants.

10. Benthic organisms are being exposed long-term to sediment lead and zinc concentrations found in Coeur d'Alene Lake. However, scientists disagree over whether there is any measurable injury and additional study is being requested.

11. There was no evidence supporting injury to any other species of wildlife.

12. Due to releases of hazardous substances from mining (particularly zinc), chlorophyl levels in Coeur d'Alene Lake are not at normal levels and Coeur d'Alene Lake is potentially at risk.

13. The lead level in children in the Basin has been shown to be elevated. The increased lead levels are a result of the historical and the on-going releases of mining tailings in the water and soil of the Basin during high water events.

14. There was no credible evidence shown to establish any injury to the people living in North Idaho result-ing from the consumption of fish and birds from the Basin.

15. The 1996 lead level study was the primary reason the Basin-wide RI/FS process was started by the EPA.

16. Cultural uses of water and soil by Tribe are not recoverable as natural resource damages.

## E. Trusteeship

1. The federal government has delegated primary duties to control and manage fish and birds to the State of Idaho. Neither the federal government nor the State of Idaho manage or control macro invertebrates, however such are food sources for fish and birds and are presumably managed by the trustee of the birds and the fish.

2. The submerged lands at issue belong to the State of Idaho and the Tribe. The federal government owns very little of the land at issue in the Basin where the mining tailings have come to be located. Most of the land at issue is state land or private property, so the federal government may not be the trustee of such lands. However, the federal government may still have an interest in enforcing the cleanup of such land under CERCLA.[12]

3. The federal government has jurisdiction over navigable waters in the Basin. Control and management of water quality is performed by both the federal and state governments.

12. "Under CERCLA, the cleanup of listed hazardous waste sites must be consistent with the NCP, which is a plan promulgated by the EPA that 'specifies the roles' of the federal, state, and local governments 'in responding to hazardous waste sites, and establishes the procedures for making cleanup decisions.' *United States v. City of Denver*, 100 F.3d 1509, 1511 (10th Cir.1996)." *Fireman's Fund Ins. Co. v. City of Lodi, California*, 302 F.3d 928, 949 (9th Cir.2002).

### F. Response Costs Incurred

1. Response costs due to the injury to water and soil have been incurred by the EPA in the Basin. Specifically, response costs have been established in the form of dollars spent on yard removals of lead contaminated soils in the Basin (and outside the area known as the Box which is covered by a separate consent decree with Asarco and Hecla).

2. EPA study costs related to soil and sediment also qualify as response costs under CERCLA.

### G. United States Involvement in the Basin

1. It is undisputed that the United States Government has been involved in many aspects of the Basin.

2. During World War II, the United States government controlled: the price for the metals via the premium price plan and quota system; wages for mining and non-mining personnel; the length of the work week; and approval of capital improvements, equipment and necessary chemicals for processing via the priority system.. The government provided military oversight of the security of the mills and required certain changes be made by the mills for their security. Laborers were restricted by the government from taking other employment and soldiers were offered deferments from military service to work in the mines and mills. The mines and mills were required to submit monthly operating reports to the government. The government provided financing for the exploration of new sources of metals via the exploration premium plan. The government was aware of the tailings generated from the mining and milling and of the disposal method used for such tailings. The government threatened seizure of the operations if certain conditions were not complied with by the mining companies.

3. The government was aware and approved the use of tailings as construction material for Interstate 90.

4. The Bureau of Land Management ("BLM") was involved in the dredging of the Cataldo area.

5. The United States is responsible for certain undisputed identified abandoned mines and unpatented mining claims located in the Basin.

6. Bureau of Mines ("BOM") was a sponsoring organization for an experimental study regarding approximately 500 tons of tailings that were moved to tailings ponds.

7. The United States government played an active role in metals exploration contracts in the Basin.

## III. CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS

### A. CERCLA in General

CERCLA "generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed." *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1357 (9th Cir.1990). The two central purposes of CERCLA are: "to ensure the prompt and effective cleanup of waste disposal sites, and to assure that parties responsible for hazardous substances [bear] the cost of remedying the conditions they created." *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1300 (9th Cir.1997) (internal quotation marks and citation omitted).

As recently stated by the Ninth Circuit, CERCLA is not a model of legislative clarity as it contains numerous inconsisten-

cies and redundancies. *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir.2001), (en banc) *cert. denied*, 535 U.S. 971, 122 S.Ct. 1437, 152 L.Ed.2d 381 (2002). Additionally, the limited legislative history is not very helpful in interpreting Congress' intent. In addressing issues of first impression, this Court has done its best to interpret the relevant sections of CERCLA consistent with the canons of statutory construction.

## B. Justiciability/Ripeness

■ Defendants argue that the current action for natural resource damages is barred by 42 U.S.C. § 9613(g)(1)(B)(ii) until the remedial action being performed pursuant to the RI/FS is completed. Defendants also maintain that the claims of the Plaintiffs are not ripe for court review as there is no "case or controversy" since the damages are speculative and court review at this time is not prudent in light of the on-going nature of the RI/FS. Plaintiffs argue that the response cost claim is ripe and NRD claim is also ripe as it was filed *before* any EPA actions was taken regarding the Basin-wide RI/FS. Further Plaintiff argues the claims are ripe as injury has been established in the first phase and the second phase will deal with damages.

Section 9613(g) provides in part:
Period in which action may be brought. (1) Actions for natural resource damages.... In no event may an action for damages under this Act with respect to such a vessel or facility be commenced (i) prior to 60 days after the Federal or State natural resource trustee provides to the President and the potentially responsible party a notice of intent to file suit, or (ii) before selection of the remedial action if the President is diligently

proceeding with a remedial investigation and feasibility study under section 104(b) or section 120[42 U.S.C. § 9604(b) or § 9620] ....

In this case, at the time the lawsuit for natural resource damages was filed, EPA had not made the decision to begin the RI/FS process on the Basin. Accordingly, it would be improper to allow Defendants to use § 9613 as a shield against the natural resource damage claims that were properly filed. Further, as admitted to by the Defendants, the claims for response costs are properly before the Court.

As to Defendants ripeness claim, the Court finds this argument to be without merit. Injury evidence has been presented by the Plaintiffs and based on this Court's bifurcation of the trial, the dollar amount of damages will not be addressed until the second phase of the trial. Pursuant to CERCLA, the Court will not allow for double recovery of damages and Plaintiffs will have to carry their burden of proving damages regardless of the status of the RI/FS. While the Court acknowledges that the EPA issued its' Record of Decision on September 12, 2002 on the RI/FS [13], the issues before this Court are ripe for judicial review.

## C. Alleged Taint by EPA

Defendants have repeatedly raised the issue of "taint" in this trial. Defendants argue there has been an improper co-mingling of government enforcement and regulatory functions. Plaintiffs maintain the decision by the EPA to proceed with the RI/FS was made independent of this litigation.

The testimony and record before this Court do not contain the "smoking gun"

**13.** *See* Notice of EPA's Record of Decision and of Recent Ninth Circuit Cases (Docket No. 1259).

Defendants need to support their claim of taint.[14] While the Court found it hard to believe there were no written documents explaining the decision to conduct an RI/FS, the Court is satisfied with the credibility of the testimony by EPA officials that the decision was not based on the litigation in this case. It cannot be denied that the impact of the RI/FS decision on this litigation was discussed by EPA officials and/or DOJ counsel. However, discussion of the impact does not make this litigation the driving force behind the decision to proceed with a RI/FS. The record supports the EPA officials testimony that the main factors that went into the December 1997 decision to conduct a RI/FS were: 1) the 1996 exposure assessment results indicating elevated blood levels outside the Box and elevated soil concentrations and 2) the realization that the Clean Water Act was not sufficiently addressing contamination in the floodplains, the bed and banks and the lateral lakes areas.

Ms. Nearman testified she was requested by DOJ to prepare an estimation of costs to support this litigation. She termed this request a "functional equivalent RI/FS." This "functional equivalent did not have any public process associated with it and did not involve the completion of studies to determine injury." Instead, it was a cost estimate of damages for the present litigation. The Court finds the functional equivalent RI/FS was not the reason EPA decided to conduct a comprehensive and public RI/FS on the Basin.

█ It is not this Court's job to second guess agency decisions. This court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. Inc. v. Arkansas–Best Freight System*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

"[D]eference is accorded agency environmental determinations not because the agency possesses substantive expertise, but because the agency's decision-making process is accorded a 'presumption of regularity.'" *Akiak Native Community v. U.S. Postal Service*, 213 F.3d 1140, 1146 (2000). The agency's path for conducting a basin-wide RI/FS is independent of this litigation. When Ms. Nearman transferred to the Coeur d'Alene area, one of the first issues she began to hear about was the need for cleanup outside the 21 mile superfund "Box." The players involved in the decision and the timing of the request for the "functional equivalent RI/FS" and the EPA's decision to conduct a basin-wide RI/FS are granted a presumption of regularity by this Court regarding the agency's decision to conduct a basin-wide RI/FS.

Moreover, the facts of this case are dissimilar to those in *Bethlehem Steel Corp. v. United States Environmental Protection Agency*, 638 F.2d 994, 1008–10 (7th Cir. 1980). In *Bethlehem Steel*, the same attorneys involved with reviewing and recommending a disposition of a delayed compliance order were also in charge of the ongoing enforcement proceeding against Bethlehem Steel. The court held that in light of the circumstances of that particular case, there existed sufficient questions regarding the propriety of the agency's procedures to require a remand. In the present case, certain DOJ attorneys were involved in meetings regarding the effect of a Basin-wide RI/FS, but the ultimate decision-makers regarding the Basin-wide RI/FS were not directly involved in this litigation.

The facts before this case regarding taint are also sufficiently distinguishable

---

**14.** The Court assigned certain discovery requests relating to the taint claim to United States Magistrate Mikel H. Williams. Judge Williams reviewed necessary documents and found no impropriety by the agency.

from the facts in *South Carolina Department of Health and Environmental Control v. Atlantic Steel Industries, Inc.*, 85 F.Supp.2d 596, 605 (D.S.C.1999). In *Atlantic Steel*, the agency contracted with attorneys who formerly represented other settling PRPs to sue for contribution against the non-settling PRPs. Atlantic Steel claimed "an inappropriate relationship between the agency and lawyers who formerly represented parties adverse to the agency." *Id.* at 601. The court held a "court must sometimes look beyond the administrative record presented to the court because the integrity of the administrative record is relevant to the inquiry into the propriety of an agency's decisions or its actions. *Id.* at 603. "[T]he administrative record presented to the court ... is tainted to the point that the court cannot rely upon it in its present condition." *Id.* at 605. In the present case, the DOJ attorneys who represented the agency have not been shown to have had inappropriate relationship with DOJ attorneys litigating the claims before this Court.

The Court finds that the alleged taint has not been proven by a preponderance of the evidence and is not grounds for any relief for the Defendants in this litigation. The Court leaves for another day the question of the appropriate standard of review for the basin-wide RI/FS should it be challenged in court.

### D. Retroactivity

The Court has previously addressed the Defendants arguments that CERCLA cannot be retroactively applied under the facts of this case. *See* Order dated September 30, 1999 (Docket No. 635). The Defendants argument that the retroactive application of CERCLA in this case is a taking or in violation of the due process clause of the Constitution as discussed in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), is reserved until the dollar amount of the damages is established in the second phase of the trial.

### E. Releases and/or Damages Post–Enactment

"There shall be no recovery where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before the enactment date of this Act." 42 U.S.C. § 9607(f)(1). It is undisputed based on the testimony of the historical experts and mining company representatives that the mining companies dumped mill tailings directly into the creeks and rivers of the Basin.

CERCLA was enacted on December 11, 1980. Defendants argue that since they were impounding tailings from around 1968 on, there were no "releases" post-enactment. Further, since the "injury" occurred at the time of the release and the environmental conditions have been continually improving since the Ellis environmental study around 1930, there are no "damages" post-enactment and the NRD claims should be dismissed. The Plaintiffs respond that hazardous substance are still being released or re-released in the Basin, so there are releases post-enactment. Plaintiffs also argue that it is the date an injury is quantified and not when the release occurs that makes the injury in this case post-enactment.

The term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) .... 42 U.S.C. § 9601(22).

■ Did the original dumping of mine tailings prior to 1968 constitute a "release" under CERCLA? Yes. Have there been

"releases" of mine tailings after 1980? Yes, but the releases post–1968 have been minimal compared to the nature and quantity of the released hazardous substances pre–1968. The Court finds there have been post–1980 releases from the tailings ponds, waste rock piles and adits. However, the total hazardous substance load from these sources is extremely minimal in comparison to the extensive releases prior to 1968. Furthermore, NPDES permits do exist for some of the on-going discharges.

■ The next question becomes have there been "re-releases" of mine tailings since the enactment of CERCLA? Arguably, the answer to this question is yes. While the statute does not use or define the term "re-releases," the case law supports such a concept.

The recent Ninth Circuit en banc decision in *Carson Harbor Village, Ltd., v. Unocal Corp.*, 270 F.3d 863 (9th Cir.2001) (en banc) *cert. denied*, 535 U.S. 971, 122 S.Ct. 1437, 152 L.Ed.2d 381 (2002), is instructive by analogy. In *Carson Harbor*, the Court held that passive soil migration of hazardous substances could *not* be characterized as a "disposal" under CERCLA. However, the *Carson Harbor* court did not have before it whether passive soil migration of hazardous substances or passive water migration of hazardous substances could constitute a "release" under CERCLA. This Court finds the issue of whether the passive water migration of contamination unaided by human conduct can constitute a "release" to be one of first impression.

In *Carson Harbor*, 270 F.3d 863 (9th Cir.2001), (en banc), *cert. denied*, 535 U.S. 971, 122 S.Ct. 1437, 152 L.Ed.2d 381 (2002), the court noted there is a fine line distinction between a release and a disposal under CERCLA. A "disposal" is included in the definition of a "release," but not all releases are "disposals" as "disposal" is a subset of the term "release."

CERCLA defines "disposal" for purposes of § 9607(a) with reference to the definition of "disposal" in RCRA, *see* 42 U.S.C. § 9601(29), which in turn defines "disposal" as follows:

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3) (emphasis added). Under this definition, for the Partnership Defendants [Trusts] to be PRPs, there must have been a "discharge, deposit, injection, dumping, spilling, leaking, or placing" of contaminants on the property during their ownership. *Id.* Although we have previously concluded that RCRA's definition of "disposal" is "clear," *3550 Stevens Creek Assocs.*, 915 F.2d at 1362, whether the definition includes passive soil migration is an issue of first impression in this circuit.

*Id.* at 875.

In *Carson Harbor*, the Court held movement that *does* result from human contact is a disposal. *Id.* at 877. In the present case, after the human contact associated with the dumping of tailings into the adjacent waterways, the movement of contamination down the waterway or through the groundwater was not as a result of further human contact with the hazardous substances. Rather, there were re-releases of hazardous substances via the passive form of seepage, leaching and migration due to flowing water.

"Seepage" is not a descriptive term in the definitions of disposal or release. Seepage in this case seems most similar to "leaching" rather than "leaking" which ac-

cording to the *Carson Harbor* court may require a container. "Leaching" is specifically included in the definition of "release." Accordingly, this Court finds the passive migration caused by leaching from variations in low and high water is a post-enactment release under CERCLA.

The Defendants or their predecessors knowingly dumped hazardous substances into the waterways. This was the standard mining practice in the Coeur d'Alene Basin and at other mine sites beginning as long as a 100 years ago. The Defendants were aware that water runs downhill and that the hazardous substances dumped would not stay in the location they were dumped. The hazardous substances became located throughout the floodplain of Canyon Creek, Nine Mile Creek, the South Fork of the Coeur d'Alene River and the main stem of the Coeur d'Alene River. The hazardous substances also became part of the alluvial soil.

The cases cited by the Plaintiffs to support their argument for "re-releases" are also supportive of the finding that re-releases occurred post-enactment. In *A & W Smelter and Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1110 (9th Cir.1998), the court stated that the wind blowing particles from an ore pile was a "release." [15] This Court agrees that wind blown passive releases are similar to the passive releases from waste rock piles or adits (which would be "leaching" or "seeping" without active conduct by the pollution generator).

In *United States v. Shell Oil Co.*, 841 F.Supp. 962, (C.D.Cal.1993), the Court held that acid sludge seeping through the soil cover to the surface was a release. The court went on to state that "the fact they [the seeps] continue to occur presents an ongoing threat of further release of hazardous substances into the environ-

ment." *Id.* at 969. The Plaintiffs argue this recognized example of a "continuing release" is the same type of continuing release caused by the lead, cadmium and zinc in the soil and ground water that is "continually re-released" into the water during high water flows in the Basin. This Court agrees.

The Ninth Circuit has stated that the test is not generally as simple as was there an actor at the time of the release. *See Carson Harbor.* While it may make sense to determine when there was an "action" that caused the release as a spilling, leaching or dumping of tailings into the environment, the Ninth Circuit has established whether there was "action" is not the determinative factor. The action in this case occurred when the mining companies had control of the tailings and elected to dispose of said tailings into the waterways. The tailings remained in the waterways in many different forms. Some tailings immediately traveled downstream with the water and some tailings entered the groundwater and during periods of high water moved further downstream. This passive movement and migration of hazardous substances by mother nature (no human action assisting in the movement) is still a "release" for purposes of CERCLA in this case.

The Court is mindful that its interpretation of releases in this case occurring post-enactment opens the door for the Defendants to be held liable for actions taken decades earlier that continue to move through the waterways and alluvial soil. However, this interpretation is consistent with the broad remedial purposes of CERCLA. Moreover, as discussed next, even if the releases did not occur post-enactment, the Defendants would still be

**15.** This fact appears to be undisputed by the parties and the real focus of this case was on whether abandoned ore in shipping barrels was a "release" under an abandonment theory.

liable as the damages were quantified post-enactment.

## H. "Damages"

■ Alternatively, even if the Court is incorrect on its finding of liability for post–1980 "re-releases," there would still be CERCLA liability for these pre–1980 releases since the damages associated with such releases occurred post-enactment. In this case, the Defendants are liable due to the fact that the bulk of the damages have occurred post-enactment and the statute only excuses liability if the release *and* the damages both occur pre-enactment. The Court finds the Ninth Circuit opinion in *Aetna Casualty and Surety Co., Inc. v. Pintlar Corp.*, 948 F.2d 1507 (9th Cir.1991) to be binding precedent on how the Court should approach the critical definition of "damages" in § 107(f)(1). In *Pintlar*, the court defined the term "damages" in § 107(f)(1) NRD claims as "the monetary quantification stemming from an injury." *Id.* at 1515. *Pintlar* involved insurance claims for cleanup of the Bunker Hill site. In *Pintlar*, the Ninth Circuit cited the analysis of *In Re Acushnet River & New Bedford Harbor Proceedings*, 716 F.Supp. 676, 681 (D.Mass.1989) for the analytical reasoning supporting this definition. In *Acushnet*, the court rejected the argument to define "damages" in § 107(f)(1) as the injury to natural resources. In defining "damages" as the monetary quantification of the injury to natural resources, the court relied on § 107(a)(4)(C). The court reasoned the phrase "such damages" used in § 107(f)(1) did not mean injury to natural resources, but instead more closely resembled the definition of damages used in § 107(a)(4)(C) which is distinct from "injury."

Although the definition of "occurred" was not directly addressed in *Pintlar*, this Court finds that the definition in *Acushnet* for "occurred" should also be adopted.

The defendants in Acushnet argued that damages "occur" when the injury occurs. The court rejected this argument and held "that 'damages'-i.e., monetary quantification of the injury done to the natural resources-'occur' as a general rule when the property owner in this example, or some entity as a general rule, incurs expenses due to the injury to natural resources...."

DOI's regulations also support this interpretation of "damages." DOI regulations define "damages" to mean "the amount of money sought by the natural resource trustee as compensation for injury, destruction, or loss of natural resources as set forth in section 107(a) or 111(b) of CERCLA" 43 C.F.R. § 11.14(*l*).

In the case at bar, the Plaintiffs had the burden of proving by a preponderance of the evidence that the "damages" of § 107(f) "occurred" after enactment of the Act even though significant relevant releases occurred prior to the enactment of the Act in order for the damages to be recoverable under § 107(f)(1). Plaintiffs have established by a preponderance of the evidence that a significant amount of the damages occurred post-enactment when the federal government and Tribe began studying the "injury" caused by the mining industry and how to clean up the injury to the natural resources. Accordingly, the Plaintiffs' claims for damages are viable as post-enactment claims under CERCLA.

## F. Trusteeship

■ Defendants allege the Plaintiffs are not "trustees" over many of the natural resources at issue. Defendants argue that certain natural resources are not under the *actual* stewardship of the federal government or the Tribe, so damages cannot be assessed for their injury, loss or destruction. Plaintiffs argue the federal government and the Tribe had the statutory au-

thority to control the natural resources and can therefore recover. The problem with the Plaintiffs' argument is that it ignores the State of Idaho's management and control of the natural resources and the fact the State of Idaho settled its natural resource claims.

It is true that CERCLA does not permit private parties to seek recovery for damages to natural resources held in trust by the federal, state or tribal governments nor does it allow public trustees to recover for damages to private property or other "purely private" interests. *See Ohio II*, 880 F.2d at 460 ("The legislative history of CERCLA further illustrates that damage to private property-absent any government involvement, management or control—is not covered by the natural resource damage provisions of the statute."); *Exxon Corp. v. Hunt*, 475 U.S. 355, 375, 106 S.Ct. 1103, 1116, 89 L.Ed.2d 364 (1986). *National Ass'n of Mfrs. v. U.S. Dept. of Interior*, 134 F.3d 1095, 1113(D.C.Cir.1998). "A 'trustee' is a federal, state or Indian tribal official who, in accordance with 42 U.S.C. § 9607(f)(2), is designated to 'act on behalf of the public as [a] trustee[ ] for natural resources.'" *Id.* at 1098, n. 1.

"Natural resources" is defined by CERCLA as:

land, fish, wildlife, biota, air, water, groundwater, drinking water supplies and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States...."

42 U.S.C. § 9601(16).

The Secretary of the Interior promulgated regulations for the assessment of damages for injuries to natural resources.

The Secretary stated in the preamble to the final NRDA regulations:

CERCLA provides that trustee officials can only recover damages for injuries to those resources that are related to them through ownership, management, trust, or control. These relationships are created by other Federal, State, local and tribal laws.[16]

Final Rule, 59 Fed.Reg. 14262, 14268 (Mar. 25, 1994).

Based on the Court's research and practical application of the trusteeship concept, the Court finds that whether the Tribe and the United States have exercised trusteeship over the natural resources at issue is a question of both fact and law. The parties basically agree that trusteeship is not an all or nothing concept. In fact, in many instances, co-trustees are the norm and not the exception. The factual predicate of trusteeship, however, is to be determined on a case by case basis depending on who the resource belongs to, who is it managed by, who controls the same and how the resource appertains to other resources. Resources must be under the stewardship of a trustee before damages can be assessed for their injury, loss or destruction.

██ In order to avoid a double recovery, the Court has to do what Dr. Jacobson testified to and that is give a consistent meaning to the ordinary and commonly understood interpretation of these words, i.e., which entity, if any, exercises the hands on day-to-day activity of the various natural resources. The Court rejects the Government's argument that mere statutory authority is sufficient to establish trusteeship over a natural resource. Power that is not exercised is

---

**16.** It is interesting to note that the Secretary of the Interior did *not* include the term "ap- pertain to" in what constitutes trusteeship.

not management or control even though in a legal sense the resource may belong in part or appertain to that party.

While the Government is correct in their argument that there is not a double recovery until the total value of the damaged or injured resource has been recovered, a given trustee cannot recover more than what its stewardship is determined to be. To allow otherwise would create the undesirable situation of a race to the courthouse between co-trustees with the first in time being the first in right. Moreover, once a state, federal or other public trustee recovers such damages, res judicata would prevent a second trustee from recovering the same public losses. *Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769 (9th Cir.1994) (holding that the United States and the State of Alaska as public trustees under the CWA and CERCLA could recover all lost use damages caused by the spill and that private claims for lost recreational use were barred under res judicata).

Likewise, settlement would be discouraged by a responsible party if that party knew that even though it had settled a dispute with the trustee representing either the federal, state or tribe that a second trustee representing the non-settling trustee could come in and recover not only its interest, but whatever later may be determined to be the value of the resource the settling trustee did not recover for.

The evidence has not shown nor have counsel provided legal authority that would prohibit or suggest that there cannot be co-trustees of our natural resources. In fact, the law clearly anticipates the same because in practice that is the only feasible way it could work. The migration of birds and fish from one area to another and the use of habitat as they move demonstrate that our natural resources are not static to one area. If the natural resources are damaged, killed or harmed by the acts of some third party, the only feasible way to compensate the co-trustees and avoid a double recovery or unjust enrichment to one trustee at the expense of another is to award damages in the ratio or percentage of actual management and control that is exercised by each of the various co-trustees.

The fact that a statute or treaty gives primary authority to one agency (Migratory Bird Act to Federal Government) does not prevent that agency from delegating, in fact, the oversight and management to another agency (the State). It is what is done in practice, not the underlying "statutory authority," that the Courts must look to. To hold otherwise gives validity to Defendants' argument that the Government was in privy with the State of Idaho when the Defendants settled with the State of Idaho and the federal government would be bound by the same. If the Court looks to the actual control and management of the natural resource the problems are avoided and the recovery, if any, is based on the merits of each of the trustees' cases. In this way, the federal government and the Tribe are not limited or bound by what the State of Idaho may have chosen to settle for as damages, but they cannot recover a greater percentage than what this Court determines their actual control and management were in fact. If there is a windfall to the Defendants, only the State of Idaho can complain. The State of Idaho may argue, however, that the settlement saved the State of Idaho the cost of litigating their claim. If the Defendants could not rely on the percentages established by the Court or were subject to the full amount established in this case, even though the federal government and the Tribe exercised less than 50% of the control and management of certain resources, settlement would be discouraged and the recovery to natural resources would be delayed.

The Court does not find the Tribe's argument that the natural resources "appertain to" the Tribe to be persuasive. While the Tribe may use certain natural resources in the exercise of their cultural activities, such use does not rise to the level of making a natural resource "belong or be connected as a rightful part or attribute" [17] for purposes of trusteeship analysis. The same conclusion is reached on the United States' argument that natural resources appertain to the Trustees for all resources on, under, over or associated with federal or tribal owned or administered land. This simple argument is too broad and ignores the management and control of the same natural resources by the State of Idaho or private landowners. CERCLA is a broad remedial statute, but the statute itself creates reasonable limits on trusteeship that this Court will enforce.

As to water in the Basin, the federal government has jurisdiction over the "navigable waters" pursuant to the Clean Water Act. "Navigable waters" is defined as "waters of the United States." 33 U.S.C. § 1362(7). This Court has previously ruled in another case that the Spokane River, Lake Cocur d'Alene, and relevant portions of the Coeur d'Alene River and St. Joe Rivers that flow into Lake Coeur d'Alene are "navigable waters." [18] "The EPA has interpreted 'waters of the United States' to include 'intrastate lakes, rivers, streams (including intermittent streams) ... the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce.' and 'tributaries of [those] waters.' 40 C.F.R. § 122.2(c), (e)." *Headwaters, Inc. v. Talent Irrigation District,* 243 F.3d 526 (9th Cir.2001). Non-navigable tributaries flowing into navigable streams are "waters of the United States." *United States v. TGR Corp.,* 171 F.3d 762, 764 (2d Cir.1999) and cited as authority by the Ninth Circuit in *Headwaters.* Accordingly, there is no doubt that the federal government has jurisdiction over the waters at issue in this case.

The evidence submitted during the court trial involved opinions that the federal government was or was not managing or controlling a natural resource. As indicated above, the Court does not find that this all or nothing approach to trusteeship is correct. Water, wildlife, fish, birds, and biota do not stay in one place. Therefore, it is reasonable under the terms of the statute to allocate a stewardship percentage to each trustee in order to adequately compensate multiple trustees for damage to natural resources. Accordingly, during the second phase of this trial, the Court will allow the parties to submit evidence to aid the Court in determining the percentages of trusteeship over certain resources: fish, wildlife, biota, water and groundwater. The Court does find that the federal government is a trustee over 100% of federal lands in the Basin and the Tribe is trustee over 100% of the lands within the reservation boundaries. The State of Idaho is trustee over 100% of the state-owned land. Neither the United States or the Tribe are trustees over land owned by private citizens.

### G. Res Judicata

▆ Defendants argue that the claims of United States are barred by res judicata because the State of Idaho was in privity with the United States when it entered

---

**17.** *Websters's New Collegiate Dictionary,* 54 (1979).

**18.** *See United States v. Idaho,* 95 F.Supp.2d 1094 (D.Idaho 1998), affirmed 210 F.3d 1067 (9th Cir.2000) and affirmed by Supreme Court in 533 U.S. 262, 121 S.Ct. 2135, 150 L.Ed.2d 326 (2001).

into a settlement agreement with the Defendants for natural resource damages. The United States argues it was aware of the settlement, but was not in privity with the State of Idaho and is not bound by the terms of the settlement agreement. The Court agrees with the United States.

 Although the literal definition of the term "res judicata" is expansive enough to cover both preclusion of relitigation of the same cause of action and relitigation of the same issue, the modern tendency is to refer to the aspect of the doctrine that precludes relitigation of the same issue in a separate cause of action as "collateral estoppel," and to refer to that aspect preventing relitigation of the same cause of action as "res judicata." *Rodriguez v. Department of Correction,* 136 Idaho 90, 92, 29 P.3d 401 ( 2001) (citing 46 Am.Jur.2d Judgments § 516 (1994)). Res Judicata thus applies to protect litigants from the burden of litigating the same cause of action with the same party or its privity. *Hindmarsh v. Mock,* 138 Idaho 92, 94, 57 P.3d 803 (2002).

It is well-settled that in order for res judicata to bar litigation, the following requirements must be met: (1) the same claim or cause of action arising out of the same facts must be involved in both suits; (2) there must be a final judgment on the merits in the prior action; and (3) the parties in the instant action must be the same as or in privity with the parties in the prior action in question. *Id.; Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326–27 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); Restatement (Second) of Judgments § 19. The purposes of these judicially created rules are to conserve judicial resources, protect litigants from multiple lawsuits, and foster certainty and reliance in legal relations. *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

In the present case, the claim for natural resource damages under CERCLA is the same as in the state cause of action. There was a final judgment when the parties reached a settlement of the claims. The question then becomes was there privity between the State of Idaho and the United States.

In *Tahoe Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 322 F.3d 1064, 1081–82 (9th Cir.2003) the court set forth a concise summary of when privity exists.

Even when the parties are not identical, privity may exist if "there is 'substantial identity' between parties, that is, when there is sufficient commonality of interest." *In re Gottheiner,* 703 F.2d 1136, 1140 (9th Cir.1983) (citation omitted); see also *Stratosphere Litigation,* 298 F.3d at 1142 n. 3 (finding privity when a party is "so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved") (citation omitted); *Shaw v. Hahn,* 56 F.3d 1128, 1131–32 (9th Cir.1995) (finding privity when the interests of the party in the subsequent action were shared with and adequately represented by the party in the former action); *United States v. ITT Rayonier, Inc.,* 627 F.2d 996, 1003 (9th Cir.1980) ("[A] 'privy' may include those whose interests are represented by one with authority to do so."). We made clear, in *In re Schimmels,* that privity is a flexible concept dependent on the particular relationship between the parties in each individual set of cases:

Federal courts have deemed several relationships "sufficiently close" to justify a finding of "privity" and, therefore, preclusion under the doctrine of res judicata: "First, a non-party who has succeeded to a party's interest in property

is bound by any prior judgment against the party. Second, a non-party who controlled the original suit will be bound by the resulting judgment. Third, federal courts will bind a non-party whose interests were represented adequately by a party in the original suit." In addition, "privity" has been found where there is a "substantial identity" between the party and nonparty, where the nonparty "had a significant interest and participated in the prior action," and where the interests of the nonparty and party are "so closely aligned as to be virtually representative." Finally, a relationship of privity can be said to exist when there is an "express or implied legal relationship by which parties to the first suit are accountable to non-parties who file a subsequent suit with identical issues."

*Schimmels,* 127 F.3d at 881 (citations omitted); *see also Richards v. Jefferson County,* 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) ( "Moreover, although there are clearly constitutional limits on the 'privity' exception, the term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term."); *Alpert's Newspaper Delivery Inc. v. N.Y. Times Co.,* 876 F.2d 266, 270 (2d Cir.1989) ("The issue is one of substance rather than the names in the caption of the case; the inquiry is not limited to a traditional privity analysis."); *ITT Rayonier,* 627 F.2d at 1003 ("Courts are no longer bound by rigid definitions of parties or their privies for purposes of applying collateral estoppel or res judicata.").

As generally discussed above, the trusteeship must be divided based on actual management and control. Having made this division of stewardship, the Court also finds that Trustees were not in privity with the State of Idaho when the State entered its settlement for natural resource damage. This conclusion is supported by the record that the United States and Tribe were not parties to the state settlement. While it is undisputed the United States was consulted regarding the settlement, it is clear from the face of the settlement agreement and the record that the United States and Tribe were not parties and are not bound by the terms of the settlement agreement except to the extent there can be no double recovery due to the State of Idaho settlement. Simply put, Defendants have failed to carry their burden that privity existed between the United States and the State of Idaho. Therefore, the res judicata argument fails.

**H. Divisibility**

 As a defense to joint and several liability being imposed, Defendants seek to have the Court apportion liability based on the volume of tailings discharged. Plaintiffs argue Defendants have not carried their burden to support divisibility in this case.

The defense of divisibility becomes important to avoid imposing excessive liability on parties for harm that is not fairly attributable to them. The burden is on the Defendants to prove there is a "reasonable basis" to apportion. *United States v. Monsanto Co.,* 858 F.2d 160, 171 (4th Cir.1988) aff'd in part, rev'd in part *United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988), *cert. denied, Monsanto Co. v. United States,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *O'Neil v. Picillo,* 883 F.2d 176, 178 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990). This standard flows from *Restatement (Second) of Torts,* Section 433A(1) which states:

> Damages for harm are to be apportioned among two or more causes where
>
> (a) there are distinct harms, or

(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

The Restatement cautions against making an arbitrary apportionment for its own sake. Distinct harms might apply where a site consists of non-contiguous areas of soil contamination. Single harms may also be treated as divisible in terms of degree based on relative quantities of waste discharged into the stream. However, evidence supporting divisibility must be concrete and specific. Divisibility is a question of law initially and then a question of fact. The divisibility of harm inquiry is guided by principles of causation alone. *United States v. Brighton,* 153 F.3d 307 (6th Cir.1998).[19] Where causation is unclear, divisibility is not an opportunity for courts to "split the difference" in an attempt to achieve equity. Based on the facts of this case, only subsection (b) is relevant as the broad injury in this case cannot be fingerprinted to determine its exact source.

The Court finds the present case distinguishable from *United States v. Monsanto Company,* 858 F.2d 160 (4th Cir.1988). In *Monsanto* there was no evidence that each generator was contributing the same type and quantity of hazardous substance. *Id.* at 172. In the case at bar, sufficient evidence was presented by the Plaintiffs that establishes each generator was contributing tailings and all of the tailings released contained lead, cadmium and zinc. Even though the exact percentages of lead, cadmium and zinc in the tailings from each mill is unknown and differed slightly based on the type of metal being extracted in the milling process, the Court finds the milling methodologies used in the Basin did not differ significantly from mill to mill to preclude divisibility based on the volume of tailings generated.

Clearly, there is a reasonable relationship between the waste volume, the release of hazardous substances and the harm at the site. The Court makes this statement after acknowledging that estimating releases is not an exact science. Dr. Bull calculated tailings production based on best available information, but even he had to estimate some recovery rates. Dr. Stott testified single harms may be treated as divisible in terms of degree based on relative quantities of waste discharged into the waterways. Divisibility of the common harm to the Basin based on causation using volumetric calculations may not be the "perfect" method of divisibility, but it certainly is reasonable based on the historical facts available in this particular case.

Plaintiffs seek to hold the Defendants to an unrealistic standard in order to succeed with divisibility. It seems grossly unfair and unjust for the Trustees to argue that fingerprinting of each mill's hazardous waste is required for purposes of divisibility in this particular case which scans multiple decades, changes is processing method, and changes in ownership. The Court has not required the Trustees fingerprint which release caused what harm, and no such fingerprinting should be required of the Defendants.

---

19. In *U.S. v. Township of Brighton,* at 319, the court rejected fairness-based approaches in favor of the more precise restatement approach which concentrates solely or causation:

Although we know that we cannot define for all time what is a reasonable basis for divisibility and what is not, we do take this opportunity to reject fairness-based approaches in favor of the more precise and less normative Restatement approach, which concentrates solely on causation. (Footnote omitted.) We distinguish the divisibility defense to joint and several liability from the equitable allocation principles available to defendants under CERCLA's contribution provision. The former is legal, the latter equitable.

The Court finds Defendants have presented concrete evidence to support divisibility in this case. The cause or source of the hazardous substances in the Basin was the dumping of the tailings into the waterways. The experts on both sides of this case agree that a "reasonable basis" for apportioning is to consider the amount of mining waste discharged into the waterways.[20] All of the tailings contained lead, cadmium and/or zinc and it is the damages from these three primary metals from which the Trustees seek relief. For these reasons, the Court finds divisibility based upon tailings production is reasonable in this particular case. Asarco is responsible for contributing 22% of the tailings and Hecla is responsible for contributing 31% of the tailings.

Finally, the Court's ruling on divisibility does not impact Defendants ability to also seek equitable relief in the form of a contribution action under § 113(1) of CERCLA from other mining companies if liability and damages are determined.

## I. National Contingency Plan ("NCP") Consistency With Damages Presented

 Defendants argue that Plaintiffs failed to establish that the response costs presented were consistent with the National Contingency Plan as required by CERCLA. The Court finds that this argument is a misstatement of the burden on the Plaintiffs.

Section 9607(a)(4)(A) indicates responsible parties are liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan." Section 9607(a)(4)(B) provides liability for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." Finally, § 9607(a)(4)(C) provides liability for "damages for injury to, destruction of, or loss of natural resources, including reasonable costs of assessing such injury, destruction or loss resulting from such a release." Therefore, there is no "consistency requirement" as an element for Plaintiffs to establish. Rather, after response costs have been presented, it is Defendants' burden to establish that the response costs submitted are inconsistent with the NCP.

The burden of establishing that the cleanup process is consistent with the NCP depends on whether the plaintiff in a CERCLA action is the government or "any other person": "While the United States government, or a[S]tate or Indian tribe, can obtain 'all costs of removal or remedial action ... not inconsistent with the [NCP],' any other person can obtain 'other necessary costs of response ... consistent with the [NCP].'" *Wash. State Dept. of Transp. v. Wash. Natural Gas Co.*, 59 F.3d 793, 799 (9th Cir.1995) (quoting 42 U.S.C. § 9607(a)(2), (a)(4)(A)-(B)) (emphasis added). Thus, where "the United States government, a[S]tate, or an Indian tribe is seeking recovery of response costs, consistency with the NCP is presumed," and the burden is on the defendant to rebut the presumption of consistency by establishing that the plaintiff's response action was arbitrary and capricious. *Id.*

*Fireman's Fund Ins. Co. v. City of Lodi, California*, 302 F.3d 928, 949 (9th Cir. 2002).

---

**20.** The Court acknowledges that Asarco's expert, Dr. Stott did testify he believed total ore production was more accurate than total tailings production, but the percentages of responsibility for Asarco and Hecla in comparing total production and total tailings do not differ in a significant amount. Asarco is 22% liable and Hecla 33% liable under either scenario.

The United States government is the Plaintiff in the claim for response costs. Accordingly, the Court finds § 9607(a)(4)(A) applicable and finds the USA must prove "some" response costs have been incurred. Upon this showing, the burden shifts to the Defendants to prove such costs are inconsistent with the NCP. The Court finds Plaintiff USA has established that some response costs have been incurred. The Court also finds that the Defendants did not carry their burden in establishing the incurred costs presented to the Court were inconsistent with the NCP. Defendants will have the opportunity in the second phase of this trial to challenge additional costs that may be presented as response costs by the United States.

Ms. Nearman testified that response costs were incurred for yard soil removals outside the Box. Superfund Accountant, Joseph Penwell testified bills were received and paid for yard removal work in the Basin. Earl Liverman, EPA on-scene coordinator for remedial projects in the Basin, testified that he oversaw the yard removal actions in the Basin which took place between 1997 and 2000. Specifically, he observed the yard removals being done and completed. Mr. Liverman also testified that the source of hazardous substances being removed from yards was mining tailings waste.

Without determining whether Ms. Nearman's travel costs were properly documented as being part of the response costs incurred, the Court finds Ms. Nearman's and Mr. Liverman's testimony proves by a preponderance of the evidence that some response costs have been incurred due to the hazardous substances produced by the mining companies.[21] Further, the Court finds for purposes of this phase of the trial, the yard removal costs were not established as being inconsistent with the NCP.

## J. Injury

Defendants argue that the alleged injury is still tentative and indefinite based on the on-going RI/FS and there may be no NRD injuries. The Court rejects this argument at this stage in the litigation. Both sides agree that the Department of Interior ("DOI") regulations are instructive and should be used by the Court in considering a standard for determining if Plaintiffs have met their burden in establishing "injury" to natural resources.[22] Pursuant to 43 C.F.R. § 11.14, the following definitions appear applicable for this action:

(v) *Injury* means a measurable adverse change, either long- or short-term in the chemical or physical quality or the via-

---

21. The Court acknowledges the alleged improprieties presented by Asarco for Morrison Knudsen ("MK") regarding work billed clean up work at other Superfund sites. The Court is satisfied that the United States is not aware of any alleged improprieties regarding the yard soil removals in the Basin. Additionally, even if the work of MK Environmental Services was not considered by the Court, other sources of response costs were submitted to support the Court's finding the "some" response costs have been incurred. *See,* Ex. 2369 ($2,297,004.83 costs paid to MK Environmental Services and total costs paid of $3,067,444.41).

22. Plaintiffs agree the DOI regulations are acceptable criteria and argue the Court should exercise deference to the agency in adopting these definitions. Trustees argue they have used the DOI regulations in conducting their assessment, but do not seek the rebuttable presumptions associated with conducting an assessment in accordance with the regulations. The Court finds the issue of whether the assessment was or was not conducted in accordance with the applicable regulations to be outside the scope of this stage of the litigation. While the Court will grant due deference to the agency's definitions, the Court does not find it is bound to such definitions under the facts of this case as presented during the court trial.

bility of a natural resource resulting either directly or indirectly from an exposure to a discharge of oil or a release of a hazardous substance, or exposure to a product of reactions resulting from the discharge of oil or release of a hazardous substance. As used in this part, injury encompasses the phrases "injury," "destruction," and "loss."

*(m) Destruction* means the total and irreversible loss of a natural resource.

*(x) Loss* means a measurable adverse reduction of a chemical or physical quality or viability of a natural resource.

In applying these definitions, the Court makes the following conclusions of law regarding damages to natural resources. The Court acknowledges that natural resource conditions have improved since the early 1930s, however, the Court also finds based on all the evidence submitted that injury has and continues to occur after the passage of CERCLA to the following natural resources. The quantification of the injuries will be determined in the second phase of trial.

*Water.* The testing reveals without a doubt that the exceedances in the Aquatic Life Criteria ("ALC") are continuous, regular and ongoing throughout the Basin. While some animals and fish have become acclimated to the hazardous substances in the waterways, the water quality has been injured by Defendants releases and is not recovering naturally as high water events release suspended metals.

*Soils and Sediments.* Soil analysis and the lack of vegetation in certain parts of the Basin support this Court's finding that soils and sediments have been injured by the releases of hazardous substances by Defendants.

*Riparian Resources.* Impacts to riparian resources associated with mining include barren areas caused by physical and/or chemical conditions that are not conducive to plant growth in the South Fork area of the Basin. This impact cannot be completely explained by urbanization, forest fires or other factors besides mining waste.

*Fish.* While some fish have acclimated to the increased lead, cadmium and zinc levels in the waterways, some species of fish in the waterways have clearly been injured by the hazardous substances released by Defendants.

*Wildlife.* Other than birds, the Court finds that the Government and Tribe have not carried their burden to establish that wildlife has been injured by the releases of hazardous substances by Defendants.

*Birds.* The Court finds that Plaintiffs have established that one type of bird has been injured by the releases of hazardous substances. Specifically, the Court finds that tundra swans have been injured by lead poisoning. The harm to other species is not sufficient to support by a preponderance of the evidence that Defendants are harming natural resources by their releases. The Court finds that even though scientific evidence exists showing Canadian geese and wood ducks have died due to lead poisoning, the Court finds the limited deaths are countered by the increase in the overall populations of such birds. Lengthened hunting seasons and increased bag limits support the Court's conclusion that the geese and wood ducks are increasing in number. When the total population for such birds is considered, the Court concludes that the releases by the Defendants are not harming the Canadian geese and wood ducks at a level to justify liability being imposed on Defendants for damages to natural resources. The population increases are being addressed via longer hunting seasons with increased bag limits.

The Court also finds that Plaintiffs have failed to carry their burden of proof as to injury from releases of hazardous substances to eagles in the Basin. The popu-

lation numbers in the Basin do not support a finding that releases of hazardous substances are harming the eagles.

*Groundwater.* Just as the surface waterways in the Basin have been injured by the releases of hazardous substances, so has the groundwater. Studies establish that the groundwater contains above normal amounts of lead, cadmium and zinc. The source for these hazardous substances has been shown to be the mining releases of tailings.

*Benthic Macroinvertebrates and Phytoplankton.* This is a close call for the Court. The experts disagree as to the extent of injury to benthic macroinvertebrates and phytoplankton. Based on the results of the studies presented, the Court finds Plaintiffs have carried their burden and established that some injury has occurred in both macroinvertebrates and phytoplankton.

### K. Causation

On March 30, 2001, the Court issued an order setting forth the causation standard for this case which has previously been articulated to the parties prior to the start of the trial. Upon further review, the Court is satisfied with its causation standards previously set forth. As for the response cost claim, the Trustees need not establish a direct causal connection between the hazardous substance released by the Defendants and the incurrence of response costs. *United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3rd Cir.1992). As for the NRD claims, the causation standard is a contributing factor test. In cases where releases of hazardous substances have been commingled, the Trustees have the burden of proving a release that results in commingled hazardous substance is a "contributing factor" [more than a de minimis amount—to an extent that at least some of the injury would have occurred if only the Defendant's amount of release

had occurred]. The "contributing factor" test has been adopted by the Ninth Circuit. *Boeing v. Cascade Corporation*, 207 F.3d 1177 (9th Cir.2000).

In applying this contributing factor test to the case at bar, the Court finds that Plaintiffs have established the requisite level of causation—i.e., the tailings released by these Defendants contained hazardous substances that were in such quantity as to be contributing factors to the injuries to natural resources. The loads from Asarco's 22% of the tailings and Hecla's' 31% of the tailings have been shown via the testimony of Dr. Maest and others, that each Defendant's quantity alone was large enough to be considered a contributing factor to the hazardous substances in the Basin.

## IV. CONCLUSIONS OF LAW ON COUNTERCLAIMS OF UNITED STATES AS OWNER, OPERATOR OR ARRANGER

### A. Sovereign Immunity

The threshold issue for the counterclaims is whether or not there has been a waiver of sovereign immunity by the United States. USA claims it is immune of liability as any actions taken were regulatory actions and these regulatory actions are entitled to immunity. Defendants disagree that the nature of the actions controls the waiver of immunity analysis. Defendants argue the USA is liable if a private party would be liable under the same circumstances.

Section 9620(a) of CERCLA does contain a waiver of sovereign immunity in certain situations:

(a) Application of chapter to federal Government

(1) In General

Each department, agency, and instrumentality of the United States (including

the executive, legislative, and judicial branches of government) shall be subject to and comply with, this chapter in the same manner and *to the same extent, both procedurally and substantively, as any non-governmental entity,* including liability under section 9607 of this title. (Emphasis added.)

■■■ CERCLA clearly exposes the federal government to suit. *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 10, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). However, waivers of immunity are construed narrowly in favor of the sovereign. *United States v. Williams,* 514 U.S. 527, 531, 115 S.Ct. 1611, 131 L.Ed.2d 608 (1995). The question becomes does the waiver in § 9620 limit governmental liability solely to non-regulatory acts of the government and allow regulatory actions of the government to be immune from suit. This residual immunity argument for regulatory actions by the government is not a new one. It has been raised in a number of CERCLA cases and has been rejected.[23] This Court also decides to reject such a restrictive reading of the plain language of the statute.

The plain reading of § 9620 sets forth a broad waiver of immunity where the government is acting as a private party. Action being a "governmental activity" is not alone sufficient to support the conclusion government is entitled to immunity. In the alleged facts in this case, the Defendants argue the government was engaging in activities that could make a private party liable. Therefore, it too could be liable under CERCLA. *FMC Corp. v. United States Dept. of Commerce,* 29 F.3d 833 (3rd Cir.1994); *East Bay Mun. Util. Dist. v. United States Dept. of Commerce,* 142 F.3d 479 (D.C.Cir.1998).

Finally, as the Ninth Circuit has recently ruled in *United States v. Shell Oil Co.,* 294 F.3d 1045 (9th Cir.2002), *cert. denied, Atlantic Richfield Co. v. United States,* 537 U.S. 1147, 123 S.Ct. 850, 154 L.Ed.2d 849 (2003), *cert. denied, Shell Oil Co. v. United States,* 537 U.S. 1147, 123 S.Ct. 850, 154 L.Ed.2d 849 (2003), the government's construction of § 9620(a)(1) is too narrow and the Court adopted the holdings of *FMC* and *East Bay.*

We hold that CERCLA's waiver of sovereign immunity is coextensive with the scope of liability imposed by 42 U.S.C. § 9607. If § 9607 provides for liability, then § 9620(a)(1) waives sovereign immunity to that liability.

*Id.* at 1053. Therefore, under the facts and claims of this case, the Court finds the government has waived its sovereign immunity.

**B. OPERATOR LIABILITY DURING WORLD WAR II**

■■■ Defendants maintain the Government was an operator due to its pervasive involvement with critical businesses before and during World War II. The United States argues that the only two cases dealing with mining during World War II have each held the United States was *not* an operator. This is a true statement, however, neither of the cases are binding as precedent on this Court. *East Bay Municipal Utility District v. United States Department of Commerce,* 142 F.3d 479 (D.C.Cir.1998), dealt with zinc mines and was decided pre-*Bestfoods* and *United States v. Iron Mountain Mines,* 987 F.Supp. 1277 (E.D.Cal.1997), dealt with zinc and copper mines and focused on production before and after World War II. Additionally this statement ignores the

---

**23.** In making this statement, the Court does not mean to imply there are no purely regulatory exceptions to CERCLA. If the government is performing response actions or reme-

dial action on a site, this cleanup action by the government would be immune from CERCLA liability.

fact that another circuit court has held the United States to be an operator during World War II. *FMC Corporation v. United States Department of Commerce,* 29 F.3d 833 (3rd Cir.1994) (en banc decision) involving the production of rayon for tires.

The Court begins it analysis by asking what is the definition of "operator." As noted by the court in *Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.,* 976 F.2d 1338, 1341 (9th Cir.1992): "CERCLA defines an owner or operator as 'any person owning or operating such facility....' 42 U.S.C. § 9601(20)(A). The circularity of this definition renders it useless." (Citations omitted.). In *Long Beach Unified School Dist. v. Dorothy B. Godwin California Living Trust,* 32 F.3d 1364, 1368 (9th Cir.1994) stated:

> Rather, 42 U.S.C. § 9601(20)(A) defines "owner or operator" as "any person owning or operating" a toxic waste facility, which is a bit like defining "green" as "green." But all is not lost, as we have a maxim of construction to fit every occasion. Circularity too provides a clue to the legislature's purpose, for it "strongly implies .... that the statutory terms have their ordinary meanings rather than unusual or technical meanings." *Edward Hines Lumber [Co. v. Vulcan Materials Co.],* 861 F.2d [155] at 156 [(7th Cir.1988)]; *cf. Key Tronic Corp. v. United States,* 511 U.S. 809, ——, 114 S.Ct. 1960, 1966–68, 128 L.Ed.2d 797 (1994) (construing statutory term "enforcement activities" according to its plain meaning); *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 9–11, 109 S.Ct. 2273, 2279–80, 105 L.Ed.2d 1 (1989) (relying on a "cascade of plain language"); *Cadillac Fairview/California v. Dow Chem. Co.,* 840 F.2d 691, 697 (9th Cir.1988) (resolving issue based on plain language of CERCLA). In other words, we read the statute as incorporating the common law definitions of its

terms. *Edward Hines Lumber,* 861 F.2d at 157.

Due to this tautology, the Supreme Court reviewed and clarified the definition of "operator" in *United States v. Bestfoods,* 524 U.S. 51, 66–67, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) wherein the Court held:

> [A]n operator is simply one who directs the workings of, manages or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decision about compliance with environmental regulations.

This requirement of control over the cause of the contamination is consistent with the pre-*Bestfoods* Ninth Circuit standard set forth in *Kaiser Aluminum:*

> We read *Hines* as reiterating the well-settled rule that "operator" liability under section 9607(a)(2) only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment. *See Nurad, Inc. v. Hooper & Sons Co.,* 966 F.2d 837, 842 (4th Cir.1992) (the authority to control the source of the contamination "is the definition of 'operator' that most courts have adopted"); *CPC Int'l, Inc. v. Aerojet–General Corp.,* 731 F.Supp. 783, 788 (W.D.Mich.1989) ("The most commonly adopted yardstick for determining whether a party is an owner-operator under CERCLA is the degree of control that party is able to exert over the activity causing the pollution.").

*Kaiser Aluminum* at 1341–42.

"The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous waste contamination may be forced to con-

tribute to the costs of cleanup." *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 21, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). As its name implies, "CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to cleanup hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). The question then is not confined to solely to whether Asarco and Hecla operated the day-to-day affairs of their business offices or plants but who all was involved and participated in the operations and activities of the mines and mills themselves. Based on the broad remedial nature of CERCLA, the term "operator" should not be limited to the primary or most responsible person or entity, but everyone who is potentially responsible.

CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence. *Tosco Corp. v. Koch Industries, Inc.*, 216 F.3d 886, 892 (10th Cir.2000) (citing *United States v. Cello–Foil Prods., Inc.*, 100 F.3d 1227, 1231–32 (6th Cir.1996) (defining the scope of CERCLA liability under 42 U.S.C. § 9607(a)(3)); *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 808 (8th Cir.1995) (determination of operator liability under 42 U.S.C. § 9607(a)(2) is a fact-intensive inquiry requiring consideration of the totality of circumstances), *cert. denied*, 515 U.S. 1158, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995)).

For operator liability, there must be some nexus between that person's or entity's control and the hazardous waste contained in the facility. Therefore, the Court must examine the degree of control the alleged owner/operator is able to exert over the activity causing the pollution. Thus, the question becomes under the totality of the circumstances which existed during World War II did the government "manage, direct or conduct operations specifically related to pollution" at the mines and mills of the Defendants.

In this case, the government's involvement included the control of the price for the product via the premium price plan and quota system, the control of wages for mining and non-mining personnel, control of the length of the work week, the approval of capital improvements, equipment and necessary chemicals for processing via the priority system, military oversight of the security of the mill and required changes the mills had to make to their security, laborers were restricted from taking other employment, soldiers were offered deferments from military service to work in the mines and mills, the mines and mills were required to submit monthly operating reports to the government, government financing pursuant to the exploration premium plan to encourage development of new sources of metals, the government was aware of the tailings generated from the mining and milling and of the disposal method used for such tailings, and the government threatened seizure of the operations if certain conditions were not complied with by the mining companies.

Counsel for the Government correctly argue that the people in charge of Asarco and Hecla operations were sophisticated and experienced management, but the same can be said of those in charge of the governmental agencies. The evidence clearly established that both sides understood that time and demand did not allow for the typical arms length transaction and negotiation that would normally go on between business entities. This was on all out effort where time was of the essence and the government necessarily had to call the shots. The government is not faulted for its leadership role or for doing what was necessary at the time, but it would be

naive to believe that the federal government was oblivious to the fact that hazardous waste material would not be produced in the process. Lead and zinc were in short supply and the Coeur d'Alene Basin produced approximately 40% of all those materials produced. The metals were essential to the war effort and the burden for the resulting waste should rest in part on the United States, which is all of us. In a sense, it is ironic that the Plaintiffs would suggest that the federal government was simply asking for the cooperation and assistance of the mining industry in helping with the war effort and then when it was over say, "by the way, we forgot to tell you that you will be stuck for millions of dollars for the pollution you caused in helping us out." At the very least, this was a joint undertaking in which the federal government controlled certain key elements of the process of producing the necessary metals.

The realities of the grave situation that existed and the actions that were deemed necessary by the federal government does not detract from the efforts being made by the mining companies themselves. Everyone was interested in winning the war, but time was of the essence and it was not a time for prolonged negotiation and compromise. The pervasive involvement of the federal government in critical industries, the closing of non-essential businesses, the shift in the makeup of the labor force as men were removed in order to fight for their country's freedom was the reality of the time.

While it is undoubtedly true that the three to seven years the pre-war and war effort took is a relatively short period of time in comparison to the overall mining history in the Basin, it nevertheless was a critical time in our history where large amounts of hazardous materials were a by-product of the effort. The federal government knew how the waste material was disposed of and that it was done in accordance with the customary and usual practices of the time. The federal government did not make the day-to-day decisions regarding the operation of the flumes or chutes that transported the tailings to the waterways as such was a given, and did not require government intervention.

While any one single action taken by the federal government would arguably not be sufficient to make the federal government an operator under CERCLA, taken as a whole the evidence clearly establishes that both sides understood the nature of the power that the federal government exerted (directly and indirectly) and the circumstances under which it did and which it would exert such power. The directives of the federal government were mandated and compliance was not voluntary except to the extent that everyone understood it was necessary to win the war.

The mining companies did voluntarily mine and mill during the war. Defendant mining companies did turn a profit during World War II, but the profit was significantly reduced by the government's control over production, prices and operating costs. Exhibit 5084 establishes that absent the government intervention, the mining companies' profits would have been much greater as they were after World War II when the price restrictions were lifted. Is it just under CERCLA to have the government who profited from the increased metal production at a reduced price for war efforts not share the burden associated with such production when the government's involvement was so pervasive? This Court is confident businessmen and businesswomen would agree under the totality of the circumstances, the government's widespread involvement in metal production during World War II should subject the United States to operator liability during that seven year period of

time. However, the law is often set by the Courts applying bright-line tests and in applying the tests set forth by the Supreme Court and other courts, the outcome is otherwise.

The facts in this case are very similar to the facts in *United States v. Iron Mountain Mines*, 987 F.Supp. 1277 (E.D.Calif.1997) and that Court determined the government was not an operator. In *Iron Mountain*, the district court considered similar facts and held that the government did not participate in the day-to-day management and never had the right to participate as the facility was never seized; the government never compelled the mining company to mine; the government did not require the mines to hire or fire a particular worker, the government did not assume responsibility for the hazardous substances or relieve the mining company of liability for hazardous substances, and the government did not have the authority to control the cause of the contamination at the time it was released into the environment. In sum, the court held that the government was engaged in classic economic regulation with financial incentives and this did not create CERCLA operator liability.

In *East Bay Mun. Util. Dist. v. United States Dept. of Commerce*, 142 F.3d 479 (D.C.Cir.1998), the D.C. Circuit Court of Appeals reached the same conclusion as the *Iron Mountain* court even under a more liberal authority to control theory of analysis. *East Bay* involved the zinc mines and similar government wartime actions. First, the Court held that the United States was not an operator based on an actual control theory. The government exercised no managerial control, the government regulation of labor and hours was not direct managerial or supervisory authority over the workforce which the Court held was a critical component of operator liability under the actual control test, the

government's financial backing of the mine without actual managerial control was not sufficient to create liability, and entering into an output contract does not make the government an operator. *Id.* at 485–86.

In applying an "authority to control test," the Court also found that the government was not an operator. The Court first considered the threat of seizure and held that contingent authority that was never triggered cannot create liability. *Id.* at 486. The purchase-and-loan contracts could not create liability as such contracts only gave the government the right to inspect the mines, not to manage the mines. *Id.* There was no authority to control based on a theory of duress as the mining companies were not driven to produce against their wills and did not follow the gold-mining ban. *Id.* at 486–87.

In applying these two cases to the facts before this Court, the Court concludes from a legal perspective there was a lack of actual managerial control over the mines and mills and the threat of seizure does not support a finding of liability where such a threat was never triggered. The mines and mills were not forced to produce, instead the Defendants elected to produce to aid the war effort. The Defendant mining companies actually earned a profit under the government's economic incentives.

Moreover, the facts of the case relied upon by the mining companies is clearly distinguishable from the facts at bar. In *FMC Corporation v. United States Department of Commerce*, 29 F.3d 833 (3rd Cir.1994), the *en banc* panel agreed the United States was an operator during World War II. *FMC* involved a rayon factory and not mining operations. In *FMC*, the government controlled the supply and price of raw materials, the government supplied equipment to be used in the manufacturing process, the government acted

to ensure the facility retained an adequate labor force, the government participated in the management and supervision of the labor force, the government had the authority to remove workers who were incompetent or guilty of misconduct, the government controlled the price of the product as well who could purchase the product, the government required the company to stop making regular rayon and to start producing high tenacity rayon. The Court concluded these direct managerial activities by the United States of the persons who controlled the mechanisms causing pollution created liability for the United States.

In comparing *FMC* to the current case, the Court finds there are arguably significant differences in the amount of actual control exercised by the government. In the present case, the mining companies maintained actual control over the mines and mills; the mining companies hired and fired and supervised employees; the mining companies voluntarily decided to mine for metals and to participate in the premium price plans and quotas; the mining companies owned the equipment used in the mines and mills; the government set the price for metals, but did not control who could purchase the metals at the given prices; and the mining companies controlled the mechanisms creating the tailings and the disposal of the tailings.

In applying the actual control test in *Bestfoods*, the Court finds the government did not "manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decision about compliance with environmental regulations." Even applying the broader "authority to control" test in *East Bay*, the Court concludes the government did not exercise its authority to control the mines and mills during World War II.

Therefore, the United States was not an owner/operator for purposes of CERCLA.

Finally, this Court has previously denied the affirmative defense that tailings occurred as a result of an act of war. *See* Order dated March 30, 2001, Docket No. 1101. This Court's analysis is also supported by the recent decision in *United States v. Shell Oil Co.*, 294 F.3d 1045, 1061–62 (9th Cir.2002), *cert. denied, Atlantic Richfield Co. v. United States*, 537 U.S. 1147, 123 S.Ct. 850, 154 L.Ed.2d 849 (2003), *cert. denied, Shell Oil Co. v. United States*, 537 U.S. 1147, 123 S.Ct. 850, 154 L.Ed.2d 849 (2003).

## C. ARRANGER LIABILITY

### 1. *Arranger Standard.*

 Trustees argue arranger standard requires a person to: 1) own or possess waste and arrange for its disposal; or 2) exercise actual control over the disposal of waste. *East Bay Mun. Util. Dist. v. United States Dep't of Commerce*, 948 F.Supp. 78, 93–95 (D.D.C.1996). Defendants argue for broader definition of "arranger." CERCLA does not define "arranger," so the Court will look to case law for determination of when a party is an arranger.

Defendants argue arranger liability may extend to those with an indirect relationship with actual disposer. The Defendants cite the Court to *United States v. TIC Investment Corp.*, 68 F.3d 1082, 1089 (8th Cir.1995)(parent corporation officer could be liable as an arranger if "he or she had the authority to control and did in fact exercise actual or substantial control, directly or indirectly, over the arrangement for disposal, or the office site disposal, of hazardous substances").

 The "issues involved in determining 'arranger' liability under CERCLA are distinct from those involved in determining 'owner' or 'operator' liability." *Cadillac*

*Fairview/California, Inc. v. United States,* 41 F.3d 562, 564 (9th Cir.1994). Applying *Bestfoods* in an arranger liability context, it appears arranger liability requires active involvement in the arrangements of disposal of hazardous substances. *Carter–Jones Lumber Co. v. Dixie Distrib. Co.,* 166 F.3d 840, 846–47 (6th Cir.1999). However, control is not a necessary factor in every arranger case. The Court must consider the totality of the circumstances of this case to determine whether the facts fit within CERCLA's remedial scheme, *United States v. Hercules, Inc.,* 247 F.3d 706 (8th Cir.2001). Although the term "arranger" is to be given a liberal interpretation, there must be "nexus" that allows one to be labeled an arranger. *Geraghty and Miller, Inc. v. Conoco, Inc.,* 234 F.3d 917, 929 (5th Cir.2000) (nexus defined as "the obligation to exercise control over hazardous waste disposal, and not the mere ability to control the disposal").

An arranger is defined by CERCLA in § 9607(a)(3) as follows:

> any person who by contract, agreement, or otherwise *arranged for disposal* or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances. (Emphasis added.)[24]

However, "arranged for" is not defined by the statute. "Congress has left this task to the courts, and the courts have at time struggled with the contours of 'arranger' liability under § 107(a)(3)." *South Florida Water Management Dist. v. Montalvo,* 84 F.3d 402, 406 (11th Cir.1996). Some courts have looked to the definition of "disposal" for guidance. *See Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988) (liberal interpretation of "disposal").

> Congress used broad language in providing for liability for person who "by contract, agreement, or *otherwise arranged for*" the disposal of hazardous substances. *See [United States v.] A & F Materials,* 582 F.Supp. [842] at 845 (S.D.Ill.1984). While the legislative history of CERCLA sheds little light on the intended meaning of this phrase, courts have concluded that a liberal judicial interpretation is consistent with CERCLAs "overwhelming remedial" statutory scheme. (Emphasis in original, footnotes and citations omitted.)

*United States v. Aceto Agr. Chemicals Corp.,* 872 F.2d 1373, 1380 (8th Cir.1989).

Section 9601(24) of CERCLA defines "disposal" as the same definition provided in § 1004 of the Solid Waste Disposal Act (42 U.S.C. § 6903(3)):

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

The Eleventh Circuit has set forth certain relevant factors used by courts in determining whether arranger liability is justified. *Concrete Sales and Services v. Blue Bird Body,* 211 F.3d 1333, 1336–37 (11th Cir.2000). The Eleventh Circuit

---

**24.** The Court notes the United States's post-trial brief cited the definition of arranger, but left out the critical phrase "by contract, agreement, or otherwise." This omission appears material to the analysis of whether or not the United States was an arranger when it contracted with the State of Idaho to pay for 92% of the construction of Interstate 90 and other arranger claims.

notes that none of the factors are dispositive of the issue. *Id.* at 1336. The factors are:

(1) whether a sale involved the transfer of a "useful" or "waste" product;

(2) whether the party intended to dispose of a substance at the time of the transaction;

(3) whether the party made the "crucial decision" to place hazardous substances in the hands of a particular facility;

(4) whether the party had knowledge of the disposal; and

(5) whether the party owned the hazardous substances.

*Id.* at 1336–37.

In *United States v. Shell Oil Co.*, 294 F.3d 1045, 1055 (9th Cir.2002), *cert. denied, Atlantic Richfield Co. v. United States*, 537 U.S. 1147, 123 S.Ct. 850, 154 L.Ed.2d 849 (2003), *cert. denied, Shell Oil Co. v. United States*, 537 U.S. 1147, 123 S.Ct. 850, 154 L.Ed.2d 849 (2003), (citing *Cadillac Fairview/Cal., Inc. v. United States*, 41 F.3d 562 (9th Cir.1994)), the court held that a "traditional" direct arranger must have direct involvement in arrangements for the disposal of waste. The Court went on to discuss the case law which supports a broader arranger theory or indirect control theory. The *Shell* court determined that mere "authority to control" was insufficient without some actual exercise of control. This legal test is consistent with *TIC Investment* which required an officer to have exercised actual control over the arrangement for disposal. This test is also consistent with the Ninth Circuit's analysis of *United States v. Northeastern Pharmaceutical & Chemical Co.*, ("*NEPACCO* "), 810 F.2d 726 (8th Cir. 1986), *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373 (8th Cir.1989). *Shell* at 1057–59.

The Court finds the applicable standard for liability as an arranger is the standard cited by the United States. Arranger liability requires a person to: 1) own or possess waste and arrange for its disposal; or 2) have the authority to control and to exercise some actual control over the disposal of waste.

### 2. *World War II Liability.*

 Based on the earlier factual analysis of the government as an operator, the Court also finds the United States was not an arranger during World War II. In *Shell*, the Ninth Circuit held the facts were similar to *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833, (3rd Cir. 1994)(en banc) and *United States v. Vertac Chem. Corp.*, 46 F.3d 803 (8th Cir.1995) wherein the other circuits held the United States was not an arranger under § 9607(a)(3) when the "manufacturing was carried out under government contracts and pursuant to government programs that gave it priority over other manufacturing; in both cases, the companies voluntarily entered into the contracts and profited from the sale; and in both cases, the United States was aware that waste was being produced, but did not direct the manner in which the companies disposed of it." *Shell* at 1059. These are similar facts to the facts presented to this Court regarding the United States' control during World War II. In the present case, the Court finds the United States did not own or possess waste or arrange for its disposal during World War II and the United States did not exercise actual control over the disposal of mining tailings. Furthermore, the factors set forth in *Concrete Sales* do not lead to a conclusion the United States was an arranger during World War II.

### 3. *Interstate 90 Construction.*

 As to the construction of Interstate 90, the Court finds the United States

was an arranger. The federal government contends that even though it paid 92% of the construction costs, exercised the ultimate authority approval over the PS & E right down to change orders of less that $1,000, conducted audits and investigations on a regular basis, that it nevertheless was the state of Idaho that had primary day to day supervision of the construction on I–90. Even though the CERCLA statute leaves much to be desired, the Court does not believe or find that Congress intended that a responsible party could avoid liability by simply having an independent contractor physically do a job that it would otherwise be responsible for. The Court is confident that most businessmen or even lay taxpayers would not buy into the argument that their tax dollars were paying 92% of the costs of something of this magnitude, but the agencies responsible did not know or oversee what construction materials were being used. Millions of cubic yards of tailings were used to line the roadbed and embankments containing thousands of tons of lead and zinc. If the federal government's argument is that it did not know it would be such a problem and that it is being asked to be responsible with hindsight, this whole case could make the same argument. The evidence established that the Federal Highway Agency in charge approved the use of tailings as borrow areas and as source material for construction even though the state of Idaho contractor may have selected the same. This was a joint venture or understanding with joint management and control by both the state of Idaho and the federal government.

Under a *Bestfoods* analysis, the fact that one party may be the primary operator or manager makes little difference. While Lady Justice is depicted with blinders on, it was never intended that she turn her head so that she couldn't see what was going on. Neither can the federal government turn its head to avoid liability for its actions. Arranger liability requires a person to: 1) own or possess waste and arrange for its disposal; or 2) have the authority to control and to exercise some actual control over the disposal of waste and the United States did both during the construction of I–90. The burden is now on the Defendants to establish the qualities of fill used were significant enough to be a contributing factor in the Basin.

### 4. *Cataldo Dredge.*

Evidence was presented during trial that BLM was involved in the dredging of the Cataldo area. The Court finds that the federal government agency was one of many arrangers of mining tailings when dredging the Cataldo area. However, the dredging did not "generate" tailings. Rather the dredging removed many tailings from the waterways. The Defendants must establish that the dredging of tailings was a contributing factor to the harm alleged in the Basin before something other than a zero allocation for this activity can be considered by the Court.

### 5.*Abandoned Mines and Owner of Unpatented Mining Claims.*

■ Evidence was presented at trial that the federal government is currently responsible for certain abandoned mines that contributed hazardous substances into the Basin. The Court finds that the United States does not become an "arranger" or "owner" for purposes of CERCLA for mining activities done by defunct mining companies.

■ The United States is also not an "arranger" or "owner" for mining activities of unpatented mining claims. This Court agrees with the court in *United States v. Friedland,* 152 F.Supp.2d 1234 (D.Colo. 2001), that the United States' interest in lands subject to unpatented mining claims does not make it an "owner" of such min-

ing claims under CERCLA. Prior to the passage of Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.*, the BLM did not have authority to regulate mining activities and environmental damage that may flow from such mining activities. Defendants have failed to establish that after 1976, the BLM failed to regulate the mining activities or arranged for the disposal of tailings from unparented mining claims.

Moreover, the quantity of any releases from the abandoned mines and unpatented mining claims are so minimal, that a zero allocation would be applied by the Court if the United States was in any way liable for such activities.

### 6. *Bureau of Mines Reclamation Study.*

 Defendants seek to hold the United States liable as an arranger of hazardous substances based on the involvement of the Bureau of Mines ("BOM") in a floodplain reclamation study in the early 1980s. BOM was the "sponsoring organization" for an experimental study of how land impacted by tailings could be reclaimed by moving tailings to tailings ponds. Approximately 500 tons of tailings which were historically generated by the mining activities were moved to 2 lined and 2 unlined tailings ponds.

There is no dispute that the study was not proposed by BOM. Rather, the study was proposed by the Greater Shoshone County, Inc. ("GSCI"). GSCI was a group of mining companies and other businesses seeking to improve Shoshone County. Dames and Moore was hired as the subcontractor of the study and was responsible for the design, management and implementation of the study. As the "sponsoring organization," BOM approved and funded the study. The study was implemented to reduce the environmental impact of the tailings. This activity is not the type of action intended by Congress to create arranger liability. BOM did not control or arrange for the disposal of the tailings. Moreover, the Defendants failed to establish the 500 tons of tailings involved in this project were a contributing factor to the injury to natural resources in the Basin.

In making this determination, the Court analogizes the study to regulatory exceptions to CERCLA. If the government is performing response actions or remedial action on a site, this cleanup action by the government would immune it from CERCLA liability. This impoundment funded by the BOM has not been shown to have been a contributing factor to releases and the Court would allocate a zero allocation to the study if it was found by the appellate court to create arranger liability.

### 7. *Exploration Contracts by DMEA and BOM.*

 The Court finds that the exploration contracts and activities undertaken by the BOM during World War II do create arranger liability for the United States. The United States knew or should have known that the exploration would create mining tailings. The government encouraged the generation of tailings from the exploration. The United States does dispute this finding, but claims it should receive a zero allocation for these activities. The experts testified at trial the amount of tailings involved in the exploration activities was a "minuscule, very, very, very tiny" amount. The Defendants will have to prove by a preponderance of the evidence that the amount of tailings produced via these exploration activities is in an amount large enough for such tailings to be a contributing factor for causation purposes.

### D. Third Party Defense

 Defendants argue that the United States is not entitled to the third party

defense provided in CERCLA. CERCLA's third party defense requires the United States to prove by a preponderance of the evidence, that a third party was the "sole cause" of the release of a hazardous substance, the third party was not the government's employee or agent, the act or omission by the third party did not occur in connection with a contractual relationship with the government and the government exercised due care and took reasonable precautions against foreseeable acts and omissions. 42 U.S.C. § 9607(b)(3). The Court agrees that as to the areas where the United States has been found to have arranger liability as discussed above, the United States has not established that releases were the "sole cause" of a third party and would not be entitled to the defense.

■ The Court disagrees that the United States failed to exercise due care and reasonable precautions in regards to land owned by the federal government or to require actions by other downstream landowners. Defendants argue that the United States is liable for downstream lands wherein hazardous substances have come to be located due to the government's failure to require that landowners protect their land from tailings flowing onto their property. This argument is meritless. First, the amount of land owned by the federal government in the 100 year floodplain is minimal and it has not been shown that releases occurred from federal government land. Second, it is unrealistic to believe a third party has to take action to protect their property where the consequence of taking the suggested action is to make the impact of the tailings downstream even worse. Third, easements were entered into by third party landowners and the mining companies that allowed the mining companies to deposit tailings on their land. *Gross v. Bunker Hill & Sullivan Mining & Concentrating Co.*, 45 F.2d 651 (D.Idaho 1930). The United States had no control over the contractual agreements entered into by the parties.

## V. CONCLUSION

In applying the elements of the requisite causes of action, the Court finds that Plaintiffs have established Defendants' liability for their claims for response costs and for damages to natural resources under CERCLA and as well as damages under the CWA. The matter will proceed to trial to quantify the damages in this case.

## VI. ORDER

Being fully advised in the premises, the Court hereby orders that consistent with this Order, liability has been established by the Trustees. The Court will proceed to the next phase of this trial. The parties are to submit a joint scheduling order to the Court within thirty (30) days of the date of this Order. The scheduling order deadlines shall be based on a trial date for the damages portion of this trial set to begin on May 11, 2004.